## STATE EX REL. CHANDLER VS. MAIN.

As a general thing, the laws of a state can have no force outside of its territorial limits, yet a state may in the regulation of its own internal affairs, pass laws authorizing certain acts to be done out of the state, and prescribe what effect such acts shall have within it.

A state may pass laws in regard to its own citizens, which will be binding and obligatory on them when they are without its territorial limits, and for the violation of which, they may be punished in its courts, whenever the state can find them within its jurisdiction.

The proviso contained in § 5, art. 13, of the constitution, "that no person shall vote for county officers out of the county in which he resides," was intended to prohibit an elector of one county from voting for county officers, to be elected for a county in which he did not reside, and it does not prohibit an elector from voting when out of the county in which he resides, for county officers for that county.

The proviso contained in the schedule, § 11, art. 14, of the constitution, "that no elector shall be entitled to vote, except in the town, ward or precinct in which

he resides," had reference only to the first election held under it, to organize the state government.

A law which extends to a particular class, as soldiers, the privilege of voting when out of the state, for state and county officers, is not unconstitutional, by reason of not extending the same privilege to all the electors of the state, when absent from the state.

The provision in the constitution, that secures to the accused, in prosecutions by indictment or information, a trial by a jury of the county or district wherein the offence was committed, which district shall have been previously ascertained by law, refers only to such crimes as are committed *within* the state, and does not imply a prohibition against punishing crimes committed by a citizen of the state against its laws, when out of its limits.

In order to warrant a court in declaring a law unconstitutional, the conflict between it and the constitution must be clear and free from a reasonable doubt.

The military suffrage act, chap. 11, Laws 1862, is constitutional. But whether it could be so held, if the penal clauses contained in it, against illegal voting, &c., were invalid. *Quære.*

There being no provisions of law prescribing the mode of trial, and what court shall have jurisdiction of offences committed against the military suffrage act, its penal provisions are not for that reason invalid, but the legislature may by a subsequent law supply those omissions.

## ACTION OF QUO WARRANTO.

The complaint alleged in substance, that at an election held in Dane county, in Nov. 1862, for the election of a sheriff of said county, the relator received four thousand legal votes, and the respondent three thousand eight hundred and forty-two votes, whereby the relator became and was elected to said office, that he had qualified as such, and that the respondent had intruded into and usurped said office, and still continued to do so, and that his claim thereto was based on the fact that five hundred and ninety-seven votes, for said office, were cast by electors of said county, which said electors were then in the military service of the United States, and cast said votes while out of the state, under and by virtue of an act of the legislature of the state, known as "the military suffrage act," of which said votes so cast the respondent received four hundred and fifty-four, and the relator one hundred and forty-three votes, and that the said respondent so claiming to have been elected, has qualified and entered upon the performance of the duties of said office, and it was insisted that the said military suffrage act

was unconstitutional and void. The respondent demurred to the complaint, on the ground that it did not state facts suffi·cient to constitute a cause of action.

*S. U. Pinney*, for the relator, claimed that the military suf·frage act was unconstitutional and void, because, 1st. The con·stitution of the state, and the laws framed in pursuance there·of, cannot have an ex-territorial operation, and there is a want of power on the part of the legislature to pass an act which shall operate upon and control the conduct of citizens of the state, when beyond its territorial limits, and beyond the limits of its sovereignty and jurisdiction, as prescribed in sec. 1, art. 9, of the constitution. The legislature is omnipotent on all proper subjects of legislation, except where restrained by the constitution, but they are so only within their rightful sphere of action. The sovereignty of the state is co-extensive with the limits of the state, and the legislature cannot rightfully pass an act that is to operate only on persons and things out of the state. The constitution intended ·that all legislation should operate only on persons and things within the state, and the only instance in which it has provided for the exercise of a concurrent jurisdiction is mentioned in sec. 1, art. 9, in the case where rivers or lakes form a common boundary be·tween this and other states or territories. If the sovereignty or jurisdiction of the state extends beyond its boundaries in any one case, other than that mentioned, it does as to all mat·ters, and such a construction would nullify the express words of the instrument. That the holding of an election to determine by a vote of the electors of a state who shall administer its laws and conduct its affairs, is an act done under and by virtue of the sovereignty of the state, would seem to be too clear to be · doubted. It is the exercise of that power which keeps in mo·tion the whole system of government, and gives to it vitality and direction.

When an elector of this state passes beyond its boundaries, he becomes subject to the laws and regulations of another sov-

ereignty, which regulates his actions and controls his conduct, and he must rely on the laws of such state or sovereignty for protection. The laws of his own state are powerless to afford him any protection, and they cannot control his conduct in any respect. *Commonwealth vs. Blodgett*, 12 Met., 81. If the power of ex-territorial legislation, the power of passing acts which are to operate on citizens of this state when out of the state, exists in any one case, it does in all cases. The constitution does not, in terms, confer such a power, or contemplate its existence. If such a power exists, it is an implied power, and there is no limit in the constitution upon its exercise.

The question whether a citizen of this state could be indicted and punished for an offense against its laws, committed in another state, and that whether he can be empowered to exercise political privileges, when out of the state, depend upon and rest on the same foundation. State sovereignty is purely a creature of the constitution, and without and beyond it, the government has no power, no existence. An examination of the constitution, shows that it was contemplated that all acts purely political or governmental in their character authorized to be done by that instrument, are to be performed in the state, and in no instance is there to be found in that instrument anything to justify a contrary inference. Sec. 7, art. 5, const.

There is nothing in the constitution that in express terms prevents the state treasurer, attorney general, or state superintendent from keeping their offices beyond the limits of the state, or at any point they choose. It is provided that this court shall hold at least one term annually at the seat of government of the state, at such time as shall be provided by law, and the legislature is authorized to provide for holding other terms at other places when they may deem it necessary, yet it would not be contended that the legislature could authorize or compel the holding of terms of this court at New York, London, or Paris.

VOL. XVI—26

There is no provision of the constitution requiring the seat of government to be located in the state; nor is there any provision of that instrument which prescribes that an elector shall exercise the right of suffrage only within the state, but it results by necessary inference from the nature of the act, the nature of the government, the extent of its powers, and the object to be attained by the adoption of the system of government provided by the constitution. The act in question proceeds on the theory that it creates a *right* which would not otherwise exist. The right of suffrage is conferred and exists only by virtue of the constitution, and it is not in the power of the legislature to extend, modify or destroy it. It is "a right possessed under the constitution. Per WHITON, C. J., in *State vs. Williams*, 5 Wis., 316. It is true the legislature can *regulate* its exercise, but that power cannot operate out of the state. The constitution confers on citizens of the state certain other important rights, as exemption from imprisonment for debt, arising out of or founded on contract, express or implied, and that no distinction shall be made between resident aliens and citizens in reference to the possession, enjoyment or descent of property, and it is just as much in the power of the legislature to give ex-territorial force to those provisions by legislating in reference thereto to meet the case of a resident alien or of a citizen of the state when abroad, as in the case of the exercise of the right of suffrage. The constitution and the practical exposition it has always received, requires that there should be a personal attendance of the elector in the district or locality for which the officer is to be elected, to entitle the elector to a voice in determining who that officer shall be. Const., Art. 5, § 3.; Art. 6, § 1; Art. 7, § 7, 14, 15; Art. 4, § 4, 6.

Again, § 5, Art. 15, provides "that *no person* shall vote for county officers out of the county in which he resides." This relates solely to the *place* where the elector may vote for county officers. *Miller vs. Chase*, 41, Pa. St. In no part of the con-

itithation is there to be found anything that even by fair impli-
cation indicates any purpose or policy, such as has been
attempted to be carried out by this law, of allowing electors
to vote while out of the state.   The exercise of the right of
suffrage is what supports and continues the government created
by that instrument, and if any such policy was contemplated,
in reference to so important a question, it is remarkable that
there is not some unmistakable recognition of it to be found in
the constitution.   The provision of the constitution, Art. 3, §
4, that "no person shall be deemed to have lost his residence
in this state by reason of his absence on business of the state
or the United States," furnishes strong evidence in support of
the general position assumed.   This provision operates when
the absentee *returns*, and secures to him his rights as a citizen
which he would otherwise have lost.   The fact that it was
deemed necessary to make such a reservation in such cases,
implies that such a result would otherwise have followed.   It
is not reasonable to say that this has reference to persons em-
ployed in the army, who by the constitution of this state, Art.
3, § 3, and similar provisions in the constitutions of other
states, cannot acquire a new residence in another state by rea-
son of being stationed there during their term of service.   Nor
can any argument be drawn from the provisions of the consti-
tutions of other states, requiring an elector to vote in the town
or ward in which he resides, and the absence of any such
provision in ours.   Such provisions were found necessary in the
more densely populated states, to prevent a system of coloni-
zation of voters, at times resorted to, in order to secure the
ascendency of a particular party in the state legislature.   In a
new and sparsely settled state, such as this then was, such
dangers were little to be apprehended.

2. Section 6, Art. 3, provides that "laws may be passed,
excluding from the right of suffrage all persons who may have
been convicted of bribery or larceny, or of any infamous crime,"
and also depriving every person who shall make or become in-

terested in a bet or wager depending on the result of an election of the right to vote; and § 2 of the same article provides that "no person under guardianship, *non compos mentis*, or insane, shall be qualified to vote at any election, nor shall any person convicted of treason or felony be qualified to vote at any election, unless restored to civil rights. It was not intended that the question whether traitors and felons should vote should be left to the promptings of their consciences and their blunted sense of right and wrong, nor yet that the only remedy in case they should vote, should be that their votes should be rejected if it could be ascertained for whom they were cast. It was intended to give the legislature the power to protect the purity of the ballot box by penal enactments which could be severely and rigidly enforced, and that the laws regulating the right of suffrage should have a penal sanction which would compel obedience. 1 Black. Com., 54, 56, 57. It was not intended that the right of suffrage should be exercised where such penal laws could not operate, and where a disregard of the law would not constitute an offense punishable in the courts of this state, and thus open the door to "fraud, deceit and abuse," in conducting elections. Laws of a penal nature are strictly territorial in their operation. Story on Conf. of Laws, § 104; *Com. vs. Green*, 17 Mass., 548. 3. The penal clauses of the act against illegal voting are void and cannot be enforced. Sec. 7, Art. 1 of the constitution secures to the accused in prosecutions by indictment or information, the right to a speedy trial by an impartial jury of the county or district *in which the offense shall have been committed*, which county or district shall have been previously ascertained by law. Const. U. S., Art. 6, amendments. These provisions constitute an insurmountable barrier against any conviction under the penal clauses of the law. *People vs. Merrill*, 2 Park. Crim. Rep., 590; *People vs. Adams*, 3 Denio, 210; *State vs. Knight*, Tayl. Conf., 44; *Ex parte Smith*, 3 McLean, 121; *United States vs. Davis*, 2 Sum., 482; *Scoville vs.*

*Canfield,* 14 Johns., 337 ; 17 Mass., 540 ; 13 Mass., 4 ; 8 Mass., 75 ; 1 Kent. Com., 431, 443 ; 1 H. Black., 131 ; 1 Comst., 117. It is believed that no instance can be found on record, where a state legislature ever enacted a law regulating the exercise of the right of suffrage, without at the same time time attempting to secure the purity of the ballot box by the salutary safeguards of penal enactments. To do otherwise, would be to offer a premium for fraud and corruption. All experience has demonstrated the necessity of increasing rather than diminishing the restrictions, regulating the the exercise of the right of suffrage, by prescribing severer punishments in such cases, and creating new offenses and instituting a stricter scrutiny of the qualifications of electors. In view of these facts, it would be to accuse the legislature of imbecility and unparallelled stupidity to say, that they would have authorized the exercise of the right of suffrage a thousand miles from the state, by those upon whom the restraints of any but military law, are scarcely felt, where every means to commit gross deception and abuse are multipled, and by the nature of the case put almost beyond the power of detection ; had they not supposed the penal clauses of this act could be enforced. It cannot be supposed that they intended to strike down all safeguards on the right of suffrage in the army and retain them in the case of citizens voting at home, where the temptation to commit fraud and violate the law are a thousand fold less and the chance of detection and punishment -corres pondingly greater. The only just inference, then, is that the legislature would not have passed the act had they supposed the penal portion of it could not be enforced, and as the one part is a consideration or inducement for the other, the whole act must fail for the reason that the penal portion of it is void. *Slauson vs. The City of Racine,* 13 Wis., 404 ; *Warren vs. Charlestown,* 2 Gray, 98 ; *State ex rel. Houston vs. Comissioners of Perry county,* 5 Ohio St., 497.

4. But whether the army vote is legal or not so far as the

election of state officers and members of congress are concern-
en, yet it seems clear that it cannot be sustained as to county
officers, art. 15, §5.   If it was intended that the legislature
should have entire control over the exercise of the right of
suffrage as to the place of voting, why was it necessary that
this provision should be incorporated into the constitution al-
lowing electors in certain specified cases to vote ‘at the poll
nearest their residence, whether in their county or not ?   If
the right of suffrage exists under the constitution and adheres
to the elector wherever he goes, there was no need of such an
enabling clause, and the fact that it extends to one class of
cases only, those residing on Indian lands, is an implied denial
of the right of the legislature to extend it to any other class.
" Exceptions strengthen the force of a law in cases not except-
ed, so enumeration weakens it in cases not enumerated." · To
enable an elector to vote while out of the state would seem to
require quite as clear and unmistakable a recognition of that
right in the constitution, as to enable a resident on Indian lands
to vote out of his county and at the poll nearest his residence.

5.  But if, as contended, the right of voting while out of the
state, exists under the constitution, it extends to all electors
who are out of the state when an election occurs.   There is
nothing in the constitution restricting the exercise of that right
to a particular class, as farmers, soldiers, mechanics, or mer-
chants, and while this law regulates this right as it is said, it
does so only as to one class, soldiers, and denies the right to
all others, similarly situated, and this denial is in plain viola-
tion of the universal right of suffrage, so to speak, provided
for in the constitution.   To state the proposition briefly, it will
stand thus, 1. All electors of the state have right under the
constitution to vote while out of the state.   2. A soldier who
is an elector of the state while out of it may vote, but a merd-
chant who is also an elector cannot.   3. But the legislature
have not the right to regulate the exercise the right of suffrage
so as to deny it to one class and grant it to another.   There-

fore the act which allows the soldier to vote while out of the state, but denies it to all other electors similarly situated is void, 5 Wis., 314; 9 id., 28J. It is evident, that upon the theory that the constitution gives the right to an elector to vote while out of the state, the act requires a new qualification of electors not known to the constitution; that the elector must be in the *military service.* 6. But if it be said that the place where electors may exercise the right of suffrage is completely under the control of the legislature and that they may so regulate it that one class shall vote at one place and another at a different place, it will at once occur, that there is no limit to this legislation as to classes, fixed in the constitution. It would then be in the power of the legislature to make the place where an elector may exercise the right of suffrage to depend on his political faith, and upon this ground an act passed by a party in power which provided that all its political opponents should vote at Superior City and that its adherents might vote in the town or ward where they resided or might happen to be, would be constitutional, and by such legislation it could make its political ascendancy perpetual. To sustain the validity of the act in question, it is submitted would set a dangerous precedent and in disregard many of the implied restrictions of the constitution, and indeed its very letter.

*J. C. Hopkins* for respondent.

The legislature is vested with absolute power, except so far as it is expressly limited and restrained by the organic law, and in order to defeat a law the party assailing it must be able to point out clearly, and distinctly, the provision of the constitution violated; speculations and fine spun theories are not enough. 20 Wend., 363, 381, 21 Id., 563, 576. 2. In construing the constitution, the same rules should to a certain extent prevail that are adopted in the construction of statutes. Certain statutes, receive a liberal construction while others a very strict; dividing on those that are designed to enlarge, preserve and protect the rights and privileges of the citizen and those that

are intended to deprive him of such rights.   3. The constitu-
tion, article third, declares without qualification or limitation
that certain persons "who shall have resided in this state for
one year next preceding *any election* shall be deemed qualified
electors at such election."   Section three of same article pro-
vides that votes shall be by ballot, "except" &c.   Then sec-
tion 6 provides for passing laws excluding persons for certain
offenses from voting.   It is altogether silent as to the *place*
where the right may be exercised.   By these provisions the
citizen is clothed with the right of suffrage beyond the power
of the legislature to take it away (except as above stated),
and I claim it becomes the duty of the legislature in the
proper discharge of its power, to provide to the fullest extent
for the exercise of that right.   It is the highest right of a man,
and every facility should be furnished for its full, free and per-
fect enjoyment consistent with the public welfare, (of which the
legislature are sole judges.)   4.   Such being the right of the
person entitled to vote, and the obvious duty of the legisla-
ture, in what have they violated the constitution, in the enact-
ment of the law ?   The history of the adoption of the suffrage
article shows that all provisions to restrict the power of the
legislature over the subject, or to limit the exercise of the right
to a particular *locality* or *district* were rejected.   The constitu-
tion itself, permits persons to vote out of the county in which
they reside, but prohibits them from voting for county officers,
except of the county in which they reside.   Sec. 5, article 13.
The fact that the soldier does not not lose his residence by his
absence in the service will not, I presume, be questioned.
§ 4, art. 3, Constitution ; *Cooper & Fellows vs. Smith*, 8 Wis., 358.
5. The claim that it is extending our jurisdiction into other
states, is without foundation.   It does not have that effect.   It
provides that a legal voter of this state may exercise his con-
stitutional right of voting without its limits, and that it shall
be as good as if exercised within it; not that it shall be good
anywhere else, but only here.   It is not a new principle.   We

have officers appointed in other states to do acts, to take effect and be binding in this state, the same as if done here; like commissioners, &c. We might allow any officer of this state to do acts without it, and declare those acts to be binding here. It is not a question as to what effect other states will give to those acts, but what we will give them. The right or exercise of the right to vote by our soldiers, does not interfere in the least with the laws or sovereignty of the other states. It can scarcely be called an act; it is but the expression of an opinion in *writing*, by *ballot*, and this act provides the means of ascertaining that opinion in a manner so as to give it effect here, not there. The constitution of Pennsylvania, under which the decision in that state was made, *limits* the right to exercise that privilege to a *particular place*, and the decision is placed upon that ground. What is said beyond that, is mere "sounding brass." The constitution of New York allows the elector to vote *within* the district where he resides, "and not elsewhere." (Art. 2, sec. 1, N. Y. Const. of 1846.) A restriction, like an exception, proves the extent of a rule, and the framers of the constitution understood that without that restriction, the legislature had control over the place of voting, and so did the framers of ours when they rejected that restriction. Without the clause in the constitution requiring the vote to be by ballot, the legislature might have allowed the vote to be taken *viva voce*, as they formerly did in some of the states. 6. The objection that a party voting in such place or places could not be punished criminally is not one affecting the constitutionality of the law. The legislature need not impose any punishment for illegal voting; that is only a question of policy for them to decide; and if they should repeal the law, so far as that is concerned, that would not disfranchise the voters. The person running for office might bring his action for the office and show that illegal votes had been cast and counted, and the court would disallow them, and they would not be of any more use than if the voter could have been punished for the

act. The individual punishment is only a safeguard thrown around the election by the legislature, and can be removed or changed at their discretion. It does not determine the right of the person to vote; that is fixed by the constitution, and it cannot be changed. This court in the case of the *State ex rel. vs. Williams*, 5 Wis., 308, has given a construction to this article of the constitution that sustains our views in this case. In that case the legislature had required a residence of thirty days in the town where the party offered to vote. The court held that qualification repugnant to the constitution. Chief Justice WHITON, in his opinion at page 316, says: "We have no doubt that the legislature has the power to provide, that a person who has a right to vote under the constitution, shall be allowed to exercise that right only in the town where he resides, because this would be only to *prescribe the place* where a right which he possessed under the constitution shall be exercised, and fixes upon the most convenient place." This law only fixes the *place* for the exercise of a constitutional right, and fixes that at "the most *convenient* place for its exercise." The power of the legislature to fix the *place*, is in that case, settled beyond controversy, and the principle, therein decided fully sustains the law under consideration.

*Geo. B. Smith*, on the same side. 1. The persons who cast the votes, the legality of which is questioned, were electors of this state, out of the state, and they still continued to be residents and electors, though they were then in the military service. R. S., chap. 7, sec. 30; 1 Kent Com., 76, 77. 2. The legislature might pass a law authorizing them while so absent to vote wherever they might be, which should not conflict with the laws of the place where they might vote, just as they had done in regard to appointing commissioners of deeds for this state residing in other states, and appointing state agents to reside in New York, in respect to the sale of bonds, &c., under the banking law. The same power has been exercised in Ohio, Indiana and many other states. 3. The

legislative power is vested in the senate and assembly, and is sovereign and uncontrollable, except as specially restricted in the constitution, (art. 1, sec. 4, const.; 1 Black. Com., 161,) and the legislature had the power to pass this act, because there was no restriction in the constitution preventing them, and the legislature is the sole judge of the propriety and expediency of passing such an act, and it is no objection to the validity of the act that is novel and unprecedented.   4. It is no objection to the act that the legislature could not make a valid law punishing illegal voting, or any offense against the law, committed out of the state.   No constitutional obligation rests on the legislature to make any provision to punish illegal voting, and the validity of the act must be sustained, as there is nothing in the constitution which directly or by just implication, restricts or prohibits the legislature from passing it.

*By the Court,* PAINE, J.   At the special session of the legislature in 1862, a law was passed allowing the qualified electors of this state, who should be acting as volunteer soldiers in the service of the United States, to vote at the general fall elections.   The law provided in detail the mode in which such votes should be taken, returned and canvassed, and that they might be given at whatever places such soldiers should be located at the time, whether within or without this state.

At the election last fall, the relator received a majority of the votes cast in this county for the office of sheriff, exclusive of the votes of soldiers; but the latter changed the result, and if properly counted, elected the respondent, who received the certificate and entered upon the duties of the office.   This is a proceeding by *quo warranto,* by which the relator seeks to obtain possession of the office, and the only question presented, is as to the validity of the law authorizing the soldiers to vote. If that was valid, the relator must fail; if void, he must succeed.   He claims it to be unconstitutional.   But with the exception of one clause, which will be hereafter specially noticed,

it is conceded that there is no provision of the constitution which attempts to prescribe where the right of suffrage shall be exercised, or to prohibit the legislature from authorizing it to be done outside of the limits of this state. The place of voting was left by the constitution to be regulated by law. But even assuming this, the counsel for the relator still contends that an implied prohibition should be derived from the nature and scope of the constitution itself, and the general principle that the constitution and laws of a country can have no force beyond its territorial limits. This is undoubtedly, a well established general principle, applicable to all governments. And if this principle is applicable to the law in question, and the latter cannot be brought within any of the recognized qualifications of the former, the act must fail. Thus, if the legislature of this state should pass a law imposing duties upon the citizens of Illinois, it would be void, and it would be so, although there is no clause in our constitution prohibiting, the passage of such a law. It would be void by reason of the general principle referred to, and because it would be outside of the scope of the legislative power of this state. It might be said to be unconstitutional, although not prohibited, for the reason that the constitution delegated to the legislature only such legislative power as might exist in this state. Therefore, an act legislating for Illinois would be outside of the limits of that power, and might be said to be unconstitutional, just as it has been said that a law attempting to take the property of one man and give it to another, was unconstitutional, though not prohibited, because such an act was not within the scope of the legislative power.

But this principle has certain well defined and universally recognized qualifications. [And although it is true as a general proposition, that the laws of a state have no force outside of its territorial limits, it is equally true that every state may, in the regulation of its own internal affairs, authorize certain acts to be done outside of its limits, and prescribe what effect they

shall have• within them. Thus it pertains to every state to prescribe in what manner title to real estate within it shall be transferred. Each state accordingly, provides the. mode in which conveyances of land may be executed in other states, and when so executed gives to them within its limits, the effect of making a legal transfer of the title.) And to facilitate this object, it is usual for each state to authorize the appointment in other states of commissioners of deeds, who have authority to take acknowledgments and do other acts in pursuance of the laws of the state for which they are appointed. And that state gives to these acts when so done whatever effect it pleases within its own borders. We have such a law in chapter 88 of the Revised Statutes, and probably there it no state in this country which has not a similar one. Each state also pre- scribes the mode in which wills may be executed in other states in order to dispose of real and personal property within it, and in what manner depositions may be take in other states and countries, to be used as evidence in its courts.

This class of legislation has been universally recognized as valid for the reason, that although it authorizes acts to be done outside of the country where it is enacted, and specifies in what manner they may be done, still the acts themselves relate to the regulation of the internal affairs of the state over which it has acknowleged jurisdiction, and has no tendency to interfere with the sovereignty of other states in which they may be per- formed. The act authorized to be done by the law in question, seems to be purely of this character. It is the expression of the will of an elector of this state, in regard to an office to be held and exercised here. It is an act that relates as entirely to the internal concerns of this state, and is as free from all tendency to interfere with the sovereignty or jurisdiction of any other state where the ballots might happen to be cast, as are any of the acts authorized by the legislature just referred to. This state has the acknowledge power of providing in what manner title to the soil here, may be transferred. It

provides a mode by which it may be done in other states, and if so done the transfer is valid. It has equal authority to provide the mode in which the elector shall cast his ballot. It provides that he may do it in another state. If so done, why is the act not equally valid with the other? I can see no distinction in principle between them, so far as relates to the power of the state to authorize them to be done outside of its territorial jurisdiction. Or rather, if there is any distinction, it is in favor of the law authorizing the ballot, for that is a matter entirely between the state and its own citizens. While the legislation before referred to, provides the mode in which the citizens of other states as well as our own must transfer their title to our soil by deed or will, it also provides for conferring authority on the citizens of other states, as commissioners of deeds and commissioners to take testimony, who are usually residents and citizens of the other states in which they are appointed. But the power of a state over its own citizens stands upon a still stronger ground, and it may, as we shall hereafter see, not only pass permissive laws in respect to them when beyond its limits, but also laws which are binding and obligatory upon them everywhere, and for the violation of which they may be punished whenever the state can find them within its jurisdiction. If therefore, the state may provide in what manner the citizens of other states may express their will in those states, in regard to the disposition of property here, still more clearly may it provide how its own citizens in other states may express their will in regard to the disposition of an office here.

Having arrived then at the conclusion, that the law in question cannot be held invalid, as being outside of the scope of legitimate legislation by this state, it remains to inquire, whether it is prohibited by the constitution. For it is not necessary to inquire after any other grant of power than the general grant of the legislative power. It being within the scope of the legislative power, it is competent for the legislature to enact it unless prohibited. This rule with respect to the state

legislatures is too well settled to need a reference to authorities.

And it is not enough to say that the framers of the constitution never contemplated or "dreamed of" a law, authorizing a ballot to be cast outside of the state. That may be conceded, but no prohibition can be implied from it. The legislative power may undoubtedly do many things in the progress of society that the framers of the constitutition never thought of It is not enough to say that such laws are unusual and have never been passed before. This must be admitted; but no case can be found where such facts have been held to amount to a prohibition upon legislative-action. On the contrary, the rule is well settled, as stated by the supreme court of Michigan in *Tyler vs. The People*, 8 Mich., 333, "that to warrant us in declaring a statute unconstitutional, we should be able to lay our finger on the part of the constitution violated, and that the infraction should be clear and free from a reasonable doubt."

It has already been said, that with one exception, no clause of the constitution was relied on as amounting to a prohibition. That exception related to sec. 5, article 13, which is as follows: " All persons residing upon Indian lands within any county of the state, and qualified to exercise the right of suffrage under this constitution, shall be entitled to vote at the polls which may be held nearest their residence, for state, United States or county officers; *provided, that no person shall vote for county officers out of the county in which he resides.*" What is the meaning of this proviso? Did it mean to prohibit any voter from ever being allowed to cast his ballot outside of the county in which he resided, though voting for officers of such county; or did it mean only to prohibit any voter from voting for the county officers of a county in which he did not reside? It seems to me obviously the latter. In the first place, if the framers had intended to enact any general provision, confining the right of voting to any particulary place, it would naturally have been inserted as a distinct provision in connection with

the article on suffrage. But there is nothing of the kind. No attempt was made to provide anything upon the subject, until they came to consider a very small class of inhabitants of the state, the settlers on the Indian lands. For their convenience the section above referred to, gave them the right to vote at the nearest polls to their residence, for state, United States and county officers. But the nearest polls might sometimes be in another county; and the general right granted in the section having authorized the voters to vote for "county officers," if unrestricted it could have been claimed that he could vote for county officers although voting in a county in which he did not reside. Hence, the necessity for the proviso. But what county officers did the framers understand would be voted for, in such a case, if there was no restriction? Did they assume that the voter would vote for the county officers of his own county, and adopt the proviso for the purpose of preventing it? Obviously not. If they had understood it to be practicable for him to vote for the county officers of his own county, at the polls in another, they clearly would not have prohibited it at all. The same reasons which induced them to allow him to vote for any officers at polls in another county would have led them then to allow him to vote there also, for the county officers of his own county, provided they had understood it to be practicable. But they evidently assumed that it was not practicable; not because in the nature of things it would be impossible to provide a mode in which it might be accomplished, but because without some extraordinary provisions of law relating expressly to such votes, it would be wholly impracticable to vote at the general polls in one county for the county officers of another. For this reason, the prohibition of such voting was not the idea in the minds of the framers in enacting the proviso. What then was it? Clearly to prevent him in such a case from voting for the county officers of the county where he voted, but in which he did not reside. Without the proviso, this right might have been claimed by him. This

would have been obviously improper. It would be contrary to the general policy and spirit of our laws to allow the residents of one county to have a voice in deciding who should be the county officers in another. To prevent it was the sole idea and object of this proviso. The words " out of the county in which he resides," refer to the officers to be voted for, not to the act of voting. Its meaning, was not that no person should ever be allowed to vote out of the county in which he resided for the officers of that county, but that no person should ever be allowed to vote anywhere, for the officers of a county in which he did not reside. Such being its true and only meaning, it furnishes no prohibition against the law in question.

In sec. 11, art. 14, is the following provision : " The several elections provided for in this article shall be conducted according to the existing laws of the territory ; provided, that no elector shall be entitled to vote except in the town, ward or precinct where he resides." This was referred to upon the argument, but it was hardly claimed to have any direct application to the question. By its express terms, it applies only to the elections provided for in the schedule, which were the first elections to accomplish the organization of the state government. It might just as well be said, that it required all elections under the constitution to be forever conducted according to the then existing laws of the territory, as to say that it had the effect of making the proviso applicable to any election, other than those provided for in that article. It was temporary in its character, and when these first elections had been held, its function was ended. The only bearing it can have on the question under consideration is, that it serves to show that the framers did not intend to make any such restriction as to the place of voting, one of the permanent provisions of the constitution. Where they intended it to exist, as in the temporary provisions of the schedule, they expressed it in clear and positive terms. In those provisions that were designed to be permanent, they made no attempt to express it, hence they in-

tended to leave the legislature unrestricted, to provide in its discretion where the right of suffrage might be exercised.

The counsel for the relator relied upon the uniform practice hitherto, and claimed that it amounted to a practical exposition of the constitution against the validity of a law like the one in question. But that position cannot be sustained. If an act may be accomplished in several different modes, the fact that the legislature, for a given time uniformly provides for only one mode, does not at all imply that in their opinion they could not have provided any other. The argument from practical exposition in such a case, would go only to sustain the validity of the mode provided, not to deny the validity of any other. In the case of *Chase vs. Miller*, reported in the American Law Register for January, 1863, the supreme court of Pennsylvania held the law of that state authorizing its soldiers to vote outside of its limits unconstitutional. But the decision is based upon an express provision of their constitution, requiring a residence by the voter " in the election district where he offers to vote, ten days immediately preceding such election," &c. Their law did not organize any " election districts" outside of the state, and for that reason the court held it void. Whether they could have done that or not, the court did not attempt to determine. We have no such clause in our constitution, and the decision is therefore inapplicable here. I conclude therefore, that there is nothing in the constitution which amounts to a prohibition of this law.

But the counsel for the relator contends, that if it is possible for the legislature to authorize any elector to cast his ballot out of the state, then this law is void because it is confined to soldiers and does not provide that all electors who were absent from the state might vote. This conclusion was based upon the assumption that not to provide that they might vote out of the state, if it could possibly be done, amounted to a disfranchisement of such elector. But this is clearly untenable. So long as electors are at liberty to vote at their places of

residence, they cannot be said to be disfranchised, because the legislature does not provide that they may vote elsewhere. And if the legislature does see fit to provide upon special reasons, that a certain class may vote elsewhere, those not belonging to that class have no ground of complaint. They may still exercise the right at home, if they choose to stay. The right of suffrage is given by the constitution and the elector cannot be deprived of it. But the legislature may provide where it shall be exercised. And no elector can claim to be deprived of it, because not allowed to exercise it at the same place where some others are allowed to do so.

But the counsel for the relator raises another objection to the law. He claims, that although the legislature may have the power to authorize the votes to be given outside of the state, still it has no power to punish any one for an offence committed outside, and therefore the seventeenth section, which provides for the punishment of persons voting illegally at such elections must fail. And he then claims, that the law falls within a principle which has been frequently recognized by this court, that when an act is passed containing some provisions which might be valid and others which are void, and those which are void were designed as compensations for, or qualifications of the others, so that the court can say, upon looking at the whole statute, that the legislature would not have passed the valid parts, except upon the supposition that the void parts could be enforced also, the whole act must fail.

If it could be held that the provision for the punishment of illegal voting was invalid, it would present a very serious question whether this principle was not applicable to this law. But we are not prepared to say that that provision is invalid. On the contrary, it seems to be well established, that every nation has the right to punish its own citizens for the violation of its laws wherever committed. This right is based upon the duty of allegiance, and it does not rest upon the assumption that one state can extend its laws into another, so as to make them di-

rectly operative there, or impose any obligation on such other state to observe them or give any effect to them; but merely that they may be personally binding upon the citizen of the state which enacts them, and justify his punishment for their violation by such state, when he returns within its limits. Story's Conflict of Laws, §§ 21, 540; Wheat. Int. Law, p. 132, 169, 176. This doctrine is thus stated in *The People vs. Tyler*, 7 Mich., 221, by CHRISTIANCY, J. "But the general principle that the laws of a country cannot render an act criminal, when committed beyond its limits, is subject to some qualifications or exceptions. Thus, every sovereignty has the right, subject to certain restrictions, to protect itself from, and to punish as crimes, certain acts which are peculiarly injurious to its rights or interests, or those of its citizens, *wherever committed;* at least if committed by a citizen or subject of such sovereignty. * * * * But though crimes in general thus become injurious to the sovereignty only when committed within its territory, there are exceptional cases standing upon peculiar grounds as already intimated. Thus (*without attempting to enumerate all*) the citizen may commit treason by acts or combinations abroad, the commerce of a nation may be injured, or its pacific relations with other governments endangered by the criminal conduct of the passengers and crews of its ships in foreign ports. In such cases the offender may be punished by the government of which he is a citizen, with this qualification, that he be afterwards found within the territory or jurisdiction of the latter, or be brought there without a violation of the rights of the sovereignty within which the act was committed; for he cannot be arrested there without the consent of the latter."

In *Adams vs. The People*, 1 Coms., 178, Judge BRONSON recognized the rule as follows: "It does not occur to me that there are more than two cases where the question of allegiance can have any thing to do with a criminal prosecution. First, when the accused is charged with a breach of the duty of al-

legiance, as in cases of treason; and second, when the government proposes to punish offenses committed by its own citizens, beyond the territorial limits of the state."

The absolute necessity of this power, with respect at least to the crime of treason, seems very clear. If the citizen could pass beyond the limits of his country, and there adhere to its enemies and wage war against his country, and afterwards return into it and laugh to scorn its power of punishment, because the offense was committed outside of it, the power of every nation to defend itself against treachery would be seriously impaired. The necessity of it is also quite apparent, with respect to many other offenses. As for example, where a state sends its agents abroad to negotiate its bonds, or for any other similar purpose; should it not have power to protect itself against an abuse of authority by embezzlement or otherwise? Such considerations show the necessity of the power, and it is recognized and practiced upon by all nations. And if the power exists at all, the case of illegal voting abroad is clearly within it. For it is purely a question between the state and its own citizens, and the act is one which would probably constitute no offence whatever against the laws of the state where committed.

But notwithstanding the existence of this right is recognized by the general principles of law, applicable to nations, there may be some room for doubt as to how it would be affected by the provision in our constitution, that the accused shall be entitled "in prosecutions by indictment or information, to a speedy public trial by an impartial jury of the county or district wherein the offense shall have been committed, which county or district shall have been previously ascertained by law." This provision clearly refers only to such crimes as are committed within the state. Can it be held to imply a prohibition against the punishment of any other offenses. I am unable to see that it does. Full effect is given to it by allowing it to control in the trial of all offenses committed within the

state. Its enactment does not imply or assume that it was impossible to punish any offenses not committed in any county or district in the state. It is silent on that subject, and it is not inconsistent with the power to inflict such punishment. If such a power existed by the general principles of law applicable to nations, the enactment of a general provision regarding crimes committed within the state, saying nothing about others, ought not to be held an abdication of it.

I am unable to say, therefore, that the provisions of this law providing for the punnishment of illegal voting under it, might not be enforced against the citizens of this state, who should violate it abroad, if they should afterwards be found here.

Possibly further legislation may be necessary, providing more particularly as to the mode of trial and what court should have jurisdiction. But if so, that may still be enacted, and the want of it does not affect the validity of the provision already adopted, establishing the offense and the liablity to punishment. If the citizens of other states should violate it, perhaps it could not be enforced against them, even though they should come here. But conceding that it could not, I should not for that reason, hold the law invalid. The military organization of companies, affords a security equal and perhaps superior to that of a registry law, against any illegal voting by citizens of other states. The probability of any successful attempt on their part, to vote under the law, was too slight to warrant the assumption, that the legislature would not have passed it, except upon the supposition that they had power to punish citizens of other states who might violate it.

I must therefore hold this law to be valid. I have examined only as to the power of the legislature to pass it. If the power exists, the policy and expediency of it are for the legislature, and not the courts to determine. Upon this question, whatever arguments may be urged against the policy of such a law, there are also certainly very strong considerations in its

favor, as adapted to the present extraordinary condition of affairs, when more than forty thousand of the citizens of this state have left it in the service of their country. But whatever else may be said upon the subject, this at least is true, that history has furnished no better example, illustrating the capacity of the people for self-government, than that furnished under this law, of the citizen soldiers pausing amid the horrors of war, to discharge their duties as the primary legislators of the republic, and to guard by an intelligent use of their ballots, to be forwarded to their homes, the welfare of their country, and those principles of civil liberty, for which they are ready, at any moment, to lay down their lives upon the field of battle.

Judgment must be entered in favor of the respondent.