[No. 4828.]

IN RE MOYER.

1. **Habeas Corpus—Pleading.**

The return to a writ of habeas corpus is a response to the writ itself and not an answer to the petition for the writ. The respondent should by his return seek to relieve himself of the imputation of having imprisoned petitioner without lawful authority by statements from which the legality of the imprisonment may be determined without regard to the statements of the petition for the writ. He is not required to deny any averment of the petition or make any issue thereon, but to answer the writ.

2. **Insurrection—Calling out Militia—Judgment of Governor not Controvertible.**

It is the duty of the governor to determine as a fact when such conditions exist in any locality as to constitute an insurrection and to demand that in the discharge of his duties as chief executive of the state he shall call out the militia to suppress it, and his determination of that fact cannot be controverted.

3. **Insurrection—Authority of Militia to Arrest and Detain Insurrectionist.**

Where the governor has declared an insurrection to exist in any locality of the state and has called out the militia to suppress such insurrection, the militia has authority to arrest and imprison any person participating in or aiding and abetting such insurrection and to detain such person in custody until the insurrection is suppressed.

4. **Same.**

Where the militia, being called out by the governor to suppress an insurrection in a county, arrested a person for participating in or aiding and abetting such insurrection, the military authorities were not required to turn over such arrested person to the civil authorities during the continuance of the insurrection, but could detain such prisoner in custody until the insurrection be suppressed, when he should be turned over to the civil authorities to be tried for such offense against the law as he may have committed.

5. **Same—Habeas Corpus.**

Where the militia engaged in suppressing an insurrection in a county, arrested and imprisoned a person for aiding and abetting such insurrection, his arrest was legal and his detention in custody of the military authorities until the insurrection is suppressed is also legal, and the courts will not interfere to release such person on writ of habeas corpus.

*Original Application for Writ of Habeas Corpus.*

Messrs. RICHARDSON & HAWKINS, for petitioner.

Mr. N. C. MILLER, Attorney General, Mr. H. J. HERSEY and Mr. I. B. MELVILLE, Assistants Attorney General, and Mr. JOHN M. WALDRON, for respondents.

On behalf of Charles H. Moyer a petition was presented representing that he was illegally restrained of his liberty in the county of San Miguel

by Sherman Bell and Bulkeley Wells. A writ of *habeas corpus* was issued, directed to these parties who, on the day it was returnable, produced the petitioner in court, and at the same time made a return to the writ whereby the jurisdiction of this court to further proceed in the matter was challenged. The averments upon which the claim of want of jurisdiction is based are to the effect that prior to the detention of petitioner His Excellency Governor Peabody, by proclamation, had determined and declared the county of San Miguel to be in a state of insurrection and that, by reason of lawlessness, disturbances and threatened acts of violence, the civil authorities of the county were unable to cope with the situation. In pursuance of this proclamation the governor directed the respondent, Sherman M. Bell, adjutant general of the state of Colorado, to forthwith order out such troops as in his judgment might be necessary, and report to the sheriff of San Miguel county, and that he use such means as, in his judgment, might be right and proper to restore peace and good order in the county and enforce obedience to the constitution and laws of the state. In pursuance of this order General Bell proceeded to the county of San Miguel in charge and command of members of the Colorado national guard, and ever since has been, and now is, actively engaged in quelling the disturbances which called forth the proclamation and the executive order above referred to; that in the discharge of these duties he became convinced that petitioner had been and, if discharged from arrest, would continue to be, an active participant in fomenting and keeping alive the condition of insurrection existing in the county; that he was and is a prominent leader of those engaged in the acts of insurrection and crime, to suppress which the national guard was called into requisition; that for these reasons he caused the arrest, appre-

hension and detention of the petitioner in the county of San Miguel, and does now restrain, detain and imprison him for the reasons and upon the grounds above set forth; that it is his purpose and intention to release and discharge petitioner from military arrest as soon as the same can be safely done with reference to the suppression of the existing state of insurrection in the county, and then surrender him to the civil authorities to be dealt with in the ordinary course of justice after such insurrection is suppressed. It is further stated that the governor has issued orders and instructions to General Bell not to surrender or release the military custody of petitioner during the existence and continuing condition of affairs in the county of San Miguel, as mentioned and set forth in the proclamation and executive order of his excellency. It is also stated that the respondent, Bulkeley Wells, is a subordinate military officer under the direct command of General Bell, and that his acts in the premises with reference to the arrest and detention of petitioner have been by virtue of express commands in that behalf issued to him by his superior officer. To this return is appended the certificate of Governor Peabody, to the effect that the matters and things set forth in the return are true, and that the arrest and present detention of petitioner were had and done in pursuance of the authority conferred upon him by the constitution of the state; that the acts of General Bell in arresting and detaining petitioner were done by his express sanction as governor of the state and commander-in-chief of its military forces, and that the insurrection recited in his proclamation has not as yet been fully suppressed. To this return a reply was filed by petitioner in the nature of a general demurrer to the effect that it is wholly insufficient in law to constitute any justification whatsoever, either for the arrest, imprisonment or further

detention of petitioner. The reply also alleges that neither on the date of the proclamation and order of the governor nor at any other time has there been a state of insurrection in the county of San Miguel.

CHIEF JUSTICE GABBERT delivered the opinion of the court.

Counsel for petitioner contend that on the facts above stated he is entitled to his discharge because the governor has no power to suspend the privilege of the writ of *habeas corpus* or declare martial law; or that, if he has such power, he has not assumed to exercise it. Special counsel representing the respondents controverts these propositions, and further contends that this court is without jurisdiction to proceed further than to deny the relief demanded, or remand the petitioner to their custody. The attorney general claims that the governor, independent of the questions of his power to declare martial law, suspend the privilege of the writ of *habeas corpus*, or the question of the jurisdiction of this court, is fully authorized under the constitution and laws of the state to suppress insurrection and lawless conditions through the power of the military under his command, and that his subordinate officers actively engaged in suppressing such insurrection by seizing and holding those engaged in acts of violence or in advising and aiding such acts to suppress which the military was called out, cannot be interfered with so long as conditions exist which require the action and the presence of the military to correct. Counsel *amici curiae*, in their views on these several questions, are divided.

The purpose of proceedings in *habeas corpus* is to determine whether or not the person instituting them is illegally restrained of his liberty, and we shall proceed to determine whether or not, under

the facts stated and the laws of this state, the peti-
tioner is entitled to his discharge, without attempt-
ing to pass specifically upon the questions raised by
his counsel. Before proceeding, however, to a dis-
cussion and determination of this question, two prop-
ositions are presented which should be disposed of.
It is urged by counsel for petitioner that certain
averments in the petition for the writ are not contro-
verted by the return. The latter is not treated as
an answer to the application but, rather, as a re-
sponse to the writ itself. The averments of the peti-
tion are made for the purpose of obtaining the writ,
and the respondent, in his answer thereto, simply
seeks to relieve himself from the imputation of hav-
ing imprisoned petitioner without lawful authority,
and this he does, or, rather, is required to do, under
the law, by statements in the return from which the
legality of the imprisonment is to be determined,
without regard to the statements of the petition for
the writ. In short, he is not required to make any
issue on the petition for the writ, but to answer
the writ.—*In re Chipchase,* 56 Kan. 357, 43 P. 264;
*Ex parte Durbin,* 14 S. W. (Mo.) 821; *Simmons v.
Georgia Iron & Coal Co.,* 61 L. R. A. 739.

By the reply it is alleged that, notwithstanding
the proclamation and determination of the governor
that a state of insurrection existed in the county of
San Miguel, that, as a matter of fact, these conditions
did not exist at the time of such proclamation or the
arrest of the petitioner, or at any other time. By
section 5, article IV of our constitution, the governor
is the commander-in-chief of the military forces of
the state, except when they are called into actual
service of the United States, and he is thereby
empowered to call out the militia to suppress insur-
rection. It must, therefore, become his duty to deter-
mine as a fact when conditions exist in a given

locality which demand that in the discharge of his duties as chief executive of the state he shall employ the militia to suppress.  This being true, the recitals in the proclamation to the effect that a state of insurrection existed in the county of San Miguel cannot be controverted.  Otherwise the legality of the orders of the executive would not depend upon his judgment, but the judgment of another co-ordinate branch of the state government.—*In re Boyle,* 57 P. (Idaho) 706; *Luther v. Borden,* 7 How. 1; *Ex parte Moore,* 64 N. C. 802; *Martin v. Mott,* 12 Wheat. 19.

By the constitution the supreme executive power of the state is vested in the governor, and he is required to take care that the laws be faithfully executed.—Section 2, article IV.  To this end he is made commander-in-chief of the military forces of the state, and vested with authority to call out the militia to execute the laws and suppress insurrection.—Section 5, *supra.*  This authority is supple-, mented by the laws of 1897—page 204, section 2— whereby it is provided that when an insurrection in the state exists or is threatened, the governor shall order out the national guard to suppress it.  These are wise provisions, for the people, in their sovereign capacity, in framing the constitution, as well as the general assembly, recognized that an insurrection might be of such proportions that the usual civil authorities of a county and the judicial department would be unable to cope with it.  Through the latter, parties engaged in such insurrection might be punished, but its prompt suppression could only be secured through the intervention of the militia.  Being vested with authority to employ the militia for a specific purpose, and it appearing from the return to the writ that the governor has called it into requisition for that purpose, his action through his subordinates cannot be interfered with so long as he

does not exceed the power which, under the fundamental law of the state and the acts of the legislature in conformity therewith, he is authorized to exercise. —*People v. District Court,* 29 Colo. 182 (205).

The crucial question, then, is simply this: Are the arrest and detention of petitioner under the facts narrated illegal? When an express power is conferred, all necessary means may be employed to exercise it which are not expressly or impliedly prohibited.—1 Story on The Constitution, § 434.

Laws must be given a reasonable construction which, so far as possible, will enable the end thereby sought to be attained. So with the constitution. It must be given that construction of which it is susceptible which will tend to maintain and preserve the government of which it is the foundation, and protect the citizens of the state in the enjoyment of their inalienable rights. In suppressing an insurrection it has been many times determined that the military may resort to extreme force as against armed and riotous resistance, even to the extent of taking the life of the rioters. Without such authority the presence of the military in a district under the control of the insurrectionists would be a mere idle parade, unable to accomplish anything in the way of restoring order or suppressing riotous conduct. If, then, the military may resort to the extreme of taking human life in order to suppress insurrection, it is impossible to imagine upon what hypothesis it can be successfully claimed that the milder means of seizing the persons of those participating in the insurrection or aiding and abetting it may not be resorted to. This is but a lawful means to the end to be accomplished. The power and authority of the militia in such circumstances are not unlike that of the police of a city or the sheriff of a county, aided by his deputies or *posse comitatus,* in suppressing

a riot. Certainly such officials would be justified in arresting the rioters and placing them in jail without warrant, and detaining them there until the riot was suppressed.—*Hallett, J., In re Application of Sherman Parker.* If, as contended by counsel for petitioner, the military, as soon as a rioter or insurrectionist is arrested, must turn him over to the civil authorities of the county, the arrest might, and in many instances would, amount to a mere farce. He could be released on bail and left free to again join the rioters or engage in aiding and abetting their action, and if again arrested the same process would have to be repeated, and thus the action of the military would be rendered a nullity. Again, if it be conceded that on the arrest of a rioter by the military he must at once be turned over to the custody of the civil officers of the county, then the military, in seizing armed insurrectionists and depriving them of their arms, would be required to forthwith return them to the hands of those who were employing them in acts of violence, or be subject to an action of replevin for their recovery, whereby immediate possession of such arms would be obtained by the rioters, who would thus again be equipped to continue their lawless conduct. To deny the right of the militia to detain those whom they arrest while engaged in suppressing acts of violence and until order is restored, would lead to the most absurd results. The arrest and detention of an insurrectionist, either actually engaged in acts of violence or in aiding and abetting others to commit such acts, violates none of his constitutional rights. He is not tried by any military court or denied the right of trial by jury; neither is he punished for violation of the law nor held without due process of law. His arrest and detention in such circumstances are merely to prevent him from taking part or aiding in a continuation of the condi-

tions which the governor, in the discharge of his official duties and in the exercise of the authority conferred by law, is endeavoring to suppress. When this end is reached he could no longer be restrained of his liberty by the military but must be, just as respondents have indicated in their return to the writ, turned over to the usual civil authorities of the county to be dealt with in the ordinary course of justice, and tried for such offense against the law as he may have committed. It is true that petitioner is not held by virtue of any warrant, but if his arrest and detention are authorized by law he cannot complain because those steps have not been taken which are ordinarily required before a citizen can be arrested and detained.

Nor do these views conflict with section 22 of the Bill of Rights, which provides that the military shall always be in strict subordination to the civil power. The governor, in employing the militia to suppress an insurrection, is merely acting in his capacity as the chief civil magistrate of the state and, although exercising his authority conferred by the law through the aid of the military under his command, he is but acting in a civil capacity. In other words, he is but exercising the civil power vested in him by law through a particular means which the state has provided for the protection of its citizens. No case has been cited where the precise question under consideration was directly involved and determined, but in cases where the courts have had occasion to speak of the authority of the military to suppress insurrection and the means which may be employed to that end, it has been stated that parties engaged in riotous conduct render themselves liable to arrest by those engaged in quelling it.—*In re Kemp*, 16 Wis. 382 (413); *Luther v. Borden, supra; Johnson v. Jones*, 44 Ill. 142.

The same rule necessarily applies to those found in the zone of the disaffected district who are aiding and abetting the insurrectionists; for such conduct, unless repressed, would result in the continuation of the insurrection, or, at least, render it more difficult to suppress. We therefore reach the conclusion that, independent of the questions of the authority of the governor to declare martial law or suspend the privilege of the writ of *habeas corpus,* that the petitioner, on the showing made by the return, is not illegally restrained of his liberty. In reaching this conclusion we are not unmindful of the argument that a great power is recognized as being lodged with the chief executive, which might be unlawfully exercised. That such power may be abused is no good reason why it should be denied. The question simply is, does it exist? If so, then the governor cannot be deprived of its exercise. The prime idea of government is that power must be lodged somewhere for the protection of the commonwealth. For this purpose laws are enacted and the authority to execute them must exist, for they are of no effect unless they are enforced. Neither is power of any avail unless it is exercised. Appeals of a possible abuse of power are often made in public debate. They are addressed to popular fears and prejudices, and often given weight in the public mind to which they are not entitled. Every government necessarily includes a grant of power lodged somewhere. It would be imbecile without it.—1 Story on The Constitution, § 425; 1 Bailey on Jurisdiction, § 296, p. 300.

Many authorities have been cited by counsel for petitioner which it is not necessary to attempt to review. They are not in conflict with the conclusions reached in this case. They treat of the power of the president to declare martial law; to suspend the privilege of the writ of *habeas corpus;* of the authority of

the military to arrest, try and punish persons not actually in the military service; and when the military may or may not temporarily supersede the usual civil authorities. None of these questions are involved in the present case. In fact, counsel for petitioner practically concede that the questions of the authority of the governor to declare martial law and suspend the writ of *habeas corpus* are not involved; because, they say, if he has such authority he has not assumed to exercise it; but it is immaterial what power in this respect may be vested in the governor, or whether he has, in fact, attempted to declare martial law or suspend the writ of *habeas corpus*. The petitioner was lawfully arrested by the military authorities while the work of suppressing the insurrection in San Miguel county was in progress. Such arrest being lawful, his restraint by respondents until it is suppressed is not illegal.

The writ is discharged, and the petitioner remanded to the custody of the respondents.

*Writ Discharged and Petitioner Remanded.*

Mr. Justice Steele, dissenting:

No person who has the slightest claim to respectability should hesitate to approve the action of the governor in enforcing the law, and I am willing to uphold him and to applaud him so long as he keeps within the lines of the constitution. But I am not willing to uphold him when, in my opinion, he breaks down the barriers erected by the people for their protection, nor am I willing to accord to the constitution elastic properties for the purpose of sustaining him, nor to join in the establishment of a precedent which will not apply to other classes or other conditions when another governor undertakes to exercise the same arbitrary power. I am not willing to concede the power claimed by the governor and exercised by

him, because, in my opinion, such power is not vested in him by the constitution. The people could never have intended to erect such an engine of oppression. It follows, of course, that if the present executive is the sole judge of the conditions which can call into action the military power of the government and can exercise all means necessary to effectually abate the conditions, and the judicial department cannot inquire into the legality of his acts, that the next governor may by his edict exercise the same arbitrary power. If the military authority may deport the miners this year, it can deport the farmers next year. If a strike which is not a rebellion must be so regarded because the governor says it is, then any condition must be regarded as a rebellion which the governor declares to be such; and if any condition must be regarded as a rebellion because the governor says so, then any county in the state may be declared to be in a state of rebellion, whether a rebellion exists or not, and every citizen subjected to arbitrary arrest and detention at the will and pleasure of the head of the executive department. We may, then, with each succeeding change in the executive branch of the government, have class arrayed against class, and interest against interest; and we shall depend for our liberty, not upon the constitution, but upon the grace and favor of the governor and his military subordinates. In no other case presented to this court have principles so important and far-reaching been involved. It was elaborately and ably argued, and the position of counsel was clearly defined; yet the court has evaded the fundamental questions presented, and has based its decision upon theories long ago determined by jurists and statesmen to be illogical and false.

On the part of the petitioner it was urged that he was illegally restrained of his liberty, that a court of competent jurisdiction had ordered him released on

*habeas corpus,* and that the military authorities had refused to release him and had refused to permit the civil authorities to serve process upon them.

On behalf of the military officers it was said that they had been ordered by the governor not to release upon writ of *habeas corpus,* and on behalf of the governor it was contended that he had declared the county of San Miguel to be in a state of insurrection and rebellion and that, under such conditions, he had authority to enforce martial law and to suspend the privilege of the writ of *habeas corpus.*

As these propositions strike at the very foundation of our government; as the court has evaded a consideration of them; and as I believe they present the only questions in the case, I shall discuss them, and ignore for the present a consideration of the opinion, with the observation that it establishes a precedent that is so repugnant to my notions of civil liberty, so antagonistic to my ideas of a republican form of government, and so shocking to my sense of propriety and justice, that I cannot properly characterize it.

We should have before us the facts. The governor of the state, on March 23, 1904, by his proclamation, said:

"Whereas, there exists in San Miguel county, Colorado, a certain class of individuals who are acting in conjunction with a certain large number of persons outside of said county who are fully armed and acting together; and

Whereas, open and public threats have been made to resist the laws of this state and offer violence to citizens and property located in San Miguel county; and

Whereas, at divers and sundry other times various crimes have been committed in San Miguel

county by or with the aid and under the direction of said vicious and lawless persons; and

Whereas, threats, intimidations and violence are threatened and believed will be resorted to by said lawless class of individuals; and

Whereas, it is stated to me by the sheriff of said San Miguel county that these forces within and without said county are about to join forces within said San Miguel county for the purpose of destroying property and inflicting personal injuries upon the citizens of said county; and

Whereas, by reason of such lawlessness and disturbances and threatened acts of violence the civil authorities are unable to cope with the situation,

Now, Therefore, I, James H. Peabody, governor and commander-in-chief of the military forces, by virtue of the power and authority in me vested, do hereby proclaim and declare the said county of San Miguel, in the State of Colorado, to be in a state of *insurrection and rebellion.*"

In the petition for the writ of *habeas corpus* filed herein the said proclamation is set forth, and it is alleged that the petitioner, while he was in the county of Ouray, was arrested upon a warrant issued by a justice of the peace of said San Miguel county and was conveyed to the county of San Miguel, where he gave bond in the penal sum of five hundred dollars for his appearance before the district court of said county on May 10, 1904; that upon his discharge from the custody of the sheriff, he was arrested by the adjutant general of the state, who was then in the county of San Miguel as the commander of a portion of the national guard of the state; that upon the 30th day of March, 1904, a writ of *habéas corpus* was issued by the judge of the district court within and for the county of Montrose, returnable on April 11, 1904; that

upon said 11th day of April, no return having been made to the writ, the court ordered the discharge of the petitioner, but that, notwithstanding the order of the court, the said respondents refused to discharge him; that the petitioner is not guilty of any offense, has violated no law, and that no indictment, information or complaint has been filed against him except the complaint mentioned under which he was admitted to bail; that the charge in the said complaint is without foundation, and that the said respondents have refused to file complaint against the petitioner, and have refused to inform him of the charge against him.

This court thereupon issued a writ returnable April 21 following.

On the return day of the writ the respondent, Sherman Bell, produced the body of the petitioner. At the same time a return to the writ was made, in which the jurisdiction of the court is challenged. The return sets forth the proclamation of the governor, and states that the respondent, having been so ordered by the governor, proceeded to the county of San Miguel with a portion of the national guard of the state; that upon his arrival at the county of San Miguel, *he had good reason* to believe and *did and does* in *good faith believe,* and upon due inquiry in the premises became personally and officially fully satisfied and convinced that the petitioner had been and, if discharged from arrest, would continue to be an active participant in fomenting and keeping alive the said condition of insurrection and rebellion, * * * and was and is a prominent leader of the bands of lawless men engaged in the acts of insurrection and crime mentioned in the proclamation of the governor; and that, in order to accomplish the suppression of said state of insurrection and rebellion, it was and is, in the judgment of said governor

and the respondent, absolutely necessary to arrest, detain and for some time to come to restrain the body of the said Charles H. Moyer, in the course of an absolutely necessary step in the matter of suppressing said state of insurrection and rebellion.    *    *    * That the exigencies of the military situation imperatively require the further detention of said Moyer to prevent him from lending aid, comfort, direction, instructions and commands to the said lawless persons.

The reply denies that there exists in the county of San Miguel a state of either insurrection or rebellion, and states that a large number of miners, having been deported from the county, had announced their intention of returning peaceably to their homes, and further announced that to that end they would resist any further interference with their persons and would resist any attempt at their re-deportation; but that their mission in returning was one of peace and no force whatever would be used by them except in defense of their persons from attack by the mob. That this petitioner has neither been at any time, nor does he now, nor would he continue to be, an active participant either in fomenting or keeping alive any condition of insurrection or rebellion, and that he has at all times conducted himself in strict conformity to the laws of the land, and has advised, in his capacity as president of the Western Federation of Miners, that no act of lawlessness should occur upon the part of any member of said federation to the end that no reflection might be cast upon said organization.

These facts present for determination the question: Is the petitioner, under the conditions shown to exist, entitled to the privilege of the writ of *habeas corpus?* If he is detained by due process of law, he is not entitled to a discharge under the writ; if he is not so detained, he is entitled to be discharged. If the privilege of the writ has been sus-

pended by proper authority, generally or in his particular case, he is not entitled to his discharge during the period of suspension. The distinction is recognized between the suspension of the privilege of the writ and the right of a military officer to refuse obedience to its commands. Judge Dixon, when chief justice of the supreme court of Wisconsin, and during the period of the Civil War, said: "I agree that there is a plain distinction between the suspension of the writ in the sense of the clause of the constitution, and the right of a military commander to refuse obedience when justified by the exigencies of war or the *ipso facto* suspension which takes place when martial law actually exists. * * * But this kind of suspension, which comes with war and exists without proclamation or other act, is limited by the necessities of war. It applies only to cases where the demands upon the officer's time are such that he cannot, consistently with his superior military duty, yield obedience to the mandates of the civil authorities, and to cases arising within districts which are properly subjected to martial law."—*In re Kemp*, 16 Wis. 368.

The return does not justify the detention of the prisoner upon the ground that the military exigencies are such that the respondent cannot leave his command for the purpose of yielding obedience to the writ. Moreover, it is common knowledge that the commander of the army of the San Miguel, when executive functions did not require his attendance in other parts of the Union, has been at the capital much of the time. The return not showing a state of facts which justify a disobedience of the writ, the petitioner is entitled to his discharge unless the return shows that he is held by due process of law. In the return it is stated that the respondent has been ordered by the executive head of the state to

refuse to surrender the petitioner, upon writ of *habeas corpus* or otherwise; and his counsel contend that the governor, under ·the constitution, has the power to suspend the privilege of the writ and that in this case he has virtually done so, although no proclamation that he.has done so has been made and although he does not expressly say so in the return. If the power to suspend the privilege of the writ is vested in the executive head of the state, it seems to me that it is not important how or in what manner it is exercised. But it is so clear that the power to suspend the privilege of the writ of *habeas corpus* is not lodged in the executive branch of the government that it seems like a waste of time to discuss the question. If there is any one question positively and finally settled, it is that the power to suspend the privilege of the writ of *habeas corpus* is solely a legislative power. It is based upon a very simple proposition, which is, that as the privilege of the writ is granted by law, it requires a law to suspend that privilege, and that the executive department cannot legislate. But let us see what the jurists, the statesmen and the text-writers have to say upon this subject.

Bollman and Swartout had been arrested at New Orleans by General Wilkinson charged with having been engaged with Burr in a treasonable conspiracy against the United States. They were discharged by the supreme court of the United States upon the ground that there was not sufficient evidence to hold them upon the charge of treason. In the course of the opinion in that case Chief Justice Marshall, in speaking of the power vested in the court to issue the writ of *habeas corpus,* said: "If at any time the public safety should require the suspension of the powers vested by this act in the courts of the United States, it is for the legislature to say so. That ques-

tion depends on political considerations on which the legislature is to decide. Until the legislative will be expressed, this court can only see its duty, and must obey the law."—4 Cranch 23.

Joseph Story, a justice of the supreme court, says, in his work on the Constitution: "It is obvious that cases of a peculiar emergency may arise which may justify—nay, even require—the temporary suspension of any right to the writ. But as it has frequently happened in foreign countries, and even in England, that the writ has, upon various pretexts and occasions, been suspended, whereby persons apprehended upon suspicion have suffered a long imprisonment, sometimes from design, and sometimes because they were forgotten, the right to suspend it is expressly confined to cases of rebellion or invasion, where the public safety may require it: a very just and wholesome restraint, which cuts down at a blow a fruitful means of oppression, capable of being abused in bad times to the worst of purposes. Hitherto no suspension of the writ has ever been authorized by congress since the establishment of the constitution. It would seem, as the power is given to congress to suspend the writ of *habeas corpus* in cases of rebellion or invasion, that the right to judge whether exigency had arisen must exclusively belong to that body."—Story on The Constitution, § 1342.

General Jackson had declared martial law at New Orleans and had suspended, as a military necessity, the privilege of the writ of *habeas corpus*. The authority of General Jackson was considered in the case of *Johnson v. Duncan,* by the supreme court of Louisiana. Judge Martin, one of the most learned jurists of his time, after citing the case *Ex parte Bollman,* said: "Again, the power of repealing a law and that of suspending it (which is a practical repeal) are

legislative powers. For *eodem modo, quo quid constituitur, eodem modo destruitur.*"

Judge Derbigny, in his opinion in the same case, said:

"The constitution of the United States, in which everything necessary to the general and individual' security has been foreseen, does not provide that in times of public danger the executive power shall reign to the exclusion of all others. It does not trust, into the hands of a dictator the reins of government. The framers of that charter were too well aware of the hazards to which they would have exposed the fate of the republic by such a provision; and had they done it, the states would have rejected a constitution stained with a clause so threatening to their liberties. In the mean time, conscious of the necessity of removing all impediments to the exercise of executive power, in cases of rebellion or invasion, they have permitted congress to suspend the privilege of the writ of *habeas corpus* in those circumstances, if the public safety should require it. Thus far, and no farther, goes the constitution."

And, having quoted from an English author, says further: "And can it be asserted that while British subjects are thus secured against oppression in the worst of times, American citizens are left at the mercy of the will of an individual who may, in certain cases, *the necessity of which is to be judged of by himself,* assume a supreme, overbearing, unbounded power! The idea is not only repugnant to the principles of any free government, but subversive of the very foundations of our own."

Caleb Cushing, who was nominated by President Grant for chief justice of the United States, said, while he was attorney general of the United States, in an opinion to the secretary of state: "And it may be assumed as a general doctrine of constitutional

jurisprudence in all the United States, that the power to suspend laws, whether those granting the writ of *habeas corpus* or any other, is vested exclusively in the legislature of the particular state.''—8 Opinions Atty. Gen. 365.

In the year 1807 President Jefferson sent to the senate, in confidence, a message detailing the circumstances attending the arrest of persons charged with treason. On the following day Senator Giles, of Virginia, a friend and supporter of the president, moved the appointment of a committee to inquire whether it was expedient, in the condition of public affairs, to suspend the privilege of the writ of *habeas corpus*. Senator Giles forthwith reported a bill authorizing the suspension of the privilege of the writ for the period of three months, and the bill was immediately passed by the senate and sent to the house in confidence. The house declared by a vote of 123 to 3 that the message ought not to be kept secret, and a public debate on the subject occurred. I shall quote from the debate somewhat at length, for the reason that there appears to have been such a unanimity of sentiment on the subject by the statesmen of that period that we should accept their views as a guide for our action.

Mr. Burwell, of Virginia, is reported to have said: ''He would ask gentlemen if they seriously believed the danger sufficiently great to justify the suspension of this most important right of the citizen, to proclaim the country in peril and to adopt a measure so pregnant with mischief by which the innocent and guilty will be involved in one common destruction? He said this was not the first instance of the kind since the formation of the federal government; there had been already two insurrections in the United States, both of which had defied the authority of congress and menaced the Union with dissolution.

Notwithstanding one of them justified the calling out of fifteen thousand men and the expenditure of one million of dollars, he had not heard of a proposition to suspend the writ of *habeas corpus*. What, then, will be said of us, if now, when the danger is over, firm in the attachment of the people to the Union, with ample resources to encounter any difficulty which may occur, we resort to a measure so harsh in its nature, oppressive in its operation and ruinous as a precedent?  *  *  *  Nothing but the most imperious necessity would excuse us in confiding to the executive, or any person under him, the power of seizing and confining a citizen, upon bare suspicion, for three months, without responsibility, for the abuse of such unlimited discretion.  *  *  *  The people of the United States would have just reason to reproach their representatives with wantonly sacrificing their dearest interests when, from the facts presented to this house, it seems the country was perfectly safe and the conspiracy nearly annihilated.  Under these circumstances there can be no apology for suspending the privilege of the writ of *habeas corpus* and violating the constitution, which declares, 'The writ of *habeas corpus* shall not be suspended, unless when, in cases of invasion or rebellion, the public safety may require it.'  *  *  *  What, in another point of light, would be the effect of passing such a law?  Would it not establish a dangerous precedent?  A corrupt and vicious administration, under the sanction and example of this law, might harass and destroy the best men of the country.  It would only be necessary to excite artificial commotions, circulate exaggerated rumors of danger, and then follows the repetition of this law by which every obnoxious person, however honest, is surrendered to the vindictive resentment of the government.  It will not be a sufficient answer that this power will not be abused by the president

of the United States. He, Mr. B. believed, would not abuse it, but it would be impossible to restrain all those who are under him. Besides, he would not consent to advocate a principle bad in itself because it will not, probably, be abused.''

Mr. Elliott, of Vermont, said: ''It is indeed difficult for me, consistently with the sincere and high respect which I entertain for the source from whence this measure originated, to express, in decorous terms, the hostility which I feel to the proposition. I am therefore disposed to consider it as an original proposition here; as a motion in this body to suspend, for a limited time, the privileges attached to the writ of *habeas corpus*. And, in this point of view, I am prepared to say that it is the most extraordinary proposition that has ever been presented for our consideration and adoption. Sir, what is the language of our constitution upon this subject? 'The privilege of the writ of *habeas corpus* shall not be suspended, except when, in cases of invasion or rebellion, the public safety shall require it.' Have we a right to suspend it in any and every case of invasion and rebellion? So far from it, that we are under a constitutional interdiction to act, unless the existing invasion or rebellion, in our sober judgment, threatens the first principles of the national compact, and the constitution itself. In other words, we can only act, in this case, with a view to national self-preservation. We can suspend the writ of *habeas corpus* only in a case of extreme emergency; that alone is *salus populi* which will justify this *lex suprema*. And is this a crisis of such awful moment? Is it necessary, at this time, to constitute a dictatorship to save the people from themselves, and to take care that the republic shall receive no detriment? What is the proposition? To create a single dictator, as in ancient Rome, in whom all power shall be vested for

a time? No; to create one great dictator and a multitude, an army of subaltern and petty despots; to invest, not only the president of the United States, but the governors of states and territories and, indeed, all persons deriving civil or military authority from the supreme executive, with unlimited and irresponsible power over the personal liberty of your citizens. * * * An eminent English author, and the most popular writer upon the subjects of legal science, considers its suspension as the suspension of liberty itself; declares that the measure ought never to be resorted to but in cases of extreme emergency, and says that the nation then parts with its freedom for a short and limited time, only to resume and secure it forever. Hence he compares the suspension of the *habeas corpus* act in Great Britain to the dictatorship of the Roman republic.''

Mr. Eppes said: ''By this bill we are called upon to exercise one of the most important powers vested in congress by the constitution of the United States. A power which suspends the personal rights of your citizens, which places their liberty wholly under the will, not of the executive magistrate only, but of his inferior officers. Of the importance of this power, of the caution which ought to be employed in its exercise, the words of the constitution afford irresistible evidence. * * * Well, indeed, may this caution have been used as to the exercise of this important power. It is, in a free country, the most tremendous power which can be placed in the hands of a legislative body. It suspends, at once, the chartered rights of the community and places even those who pass the act under military despotism. The constitution, however, having vested this power in congress and a branch of the legislature having thought its exercise necessary, it remains for us to inquire whether the present situation of our country

authorizes, on our part, a resort to this extraordinary measure.  *  *  *  This government has now been in operation thirty years; during this whole period our political charter, whatever it may have sustained, has never been suspended. Never, under this government, has personal liberty been held at the will of a single individual. Shall we, sir, suspend the chartered rights of the community for the suppression of a few desperadoes?  *  *  *  I consider the provisions in the constitution for suspending the *habeas corpus* as designed only for occasions of great national danger.''

Mr. Nelson said: ''This precedent, let me tell, gentlemen, may be ruinous, may be a most damnable precedent—a precedent which, hereafter, may be most flagrantly abused. The executive may wish to make use of more energetic measures than the established laws of the land enable him to do; he will resort to this as a precedent, and this important privilege will be suspended at the smallest appearance of danger. The effect will be that whenever a man is at the head of our affairs who wishes to oppress or wreak his vengeance on those who are opposed to him, he will fly to this as a precedent. It will truly be a precedent fraught with the greatest danger; a precedent which ought not to be set, except in a case of the greatest necessity; indeed, I can hardly contemplate a case in which, in my opinion, it can be necessary.''

Mr. Randolph said: ''If the bill passes, we are told, it will be but temporary.  *  *  *  As to the three months' continuance, I consider that as one of the most objectionable features of the bill—as a bait to the trap—as the entering wedge. If it is made reconcilable to the interests and feelings of this house to pass it for three months, do you think we will feel the same lively repugnance to it that we do now? No! It has been truly said that no man be-

comes perfectly wicked at once; and it may be affirmed, with equal truth, that a nation is never enslaved at once. Men must be initiated by degrees, and their repugnance must be gradually overcome.''

Mr. Smilie said: ''I consider this one of the most important subjects upon which we have been called to act. It is a question which is neither more nor less than, whether we shall exercise the only power with which we are clothed to repeal an important part of the constitution? It is in this case only that we have power to repeal that instrument. A suspension of the privilege of the writ of *habeas corpus* is, in all respects, equivalent to repealing that essential part of the constitution which secures that principle which has been called, in the country where it originated, the 'palladium of personal liberty.' If we recur to England, we shall find that the writ of *habeas corpus* in that country has been frequently suspended. But, under what circumstances? We find it was suspended in the year 1715, but what was the situation of the country at that time? It was invaded by the son of James II. There was a rebellion within the kingdom, and an army was organized. The same thing happened in the year 1745. On this occasion it was found necessary to suspend it. In later times, when the government had grown more corrupt, we have seen it suspended for an infinitely less cause. We have taken from the statute book of this country this most valuable part of our constitution. The convention which framed that instrument, believing that there might be cases when it would be necessary to vest a discretionary power in the executive, have constituted the legislature the judge of this necessity, and the only question now to be determined is, does this necessity exist?''

Mr. Dana said: ''I have been accustomed to view the privilege of the writ of *habeas corpus* as the

most glorious invention of man. * * * There is
another principle which appears to me highly objec-
tionable. It authorizes the arrest of persons, not
merely by the president or other high officers, but
by any person acting under him. I imagine this to
be wholly without precedent. If treason were march-
ing to force us from our seats, I would not agree to
do this. I would not agree thus to destroy the funda-
mental principles of the constitution or to commit
such an act either of despotism or pusillanimity.
Under this view of the subject, I am disposed to
reject the bill as containing a proposition on which
I cannot deliberate.''—Annals of Congress, 9th Con-
gress, 2d Session, pp. 402-24.

And the house of representatives, by a vote of
113 to 19, refused to refer this bill to a committee but,
upon first reading thereof, indefinitely postponed it;
and of the nineteen members who voted against the
motion, very many were opposed to the bill.

In February following another debate occurred,
at which time Mr. Broom, of Delaware, is reported
to have said:

''In ordinary times the laws which already exist
may be sufficient, for in such times there is no temp-
tation to transgress the limits of constitutional or
legal privileges; but in times of turbulence and com-
motion the mere formal recognition of rights will
afford too feeble a barrier against the inflamed pas-
sions of men in power, whether excited by an intem-
perate zeal for the supposed welfare of the country
or by the detestable motives of party rancor or indi-
vidual oppression. I could have wished that cir-
cumstances had never occurred which would make
it necessary to fortify, by penal laws, the constitu-
tional privilege of *habeas corpus,* and that the whole
nation, from the first to the least, had regarded it with
such religious veneration that no officer, either mili-

tary or civil, would have dared to violate it.   But recent circumstances have proved that such a wish would have been in vain, and have demonstrated, more powerfully than any abstract reasoning, the necessity and importance of further legislative provision.

"This privilege of the writ of *habeas corpus* has been deemed so important that, by the ninth section of the first article of the constitution, it is declared that it shall not be suspended unless when, in cases of rebellion or invasion, the public safety may require it.   Such is the value of this privilege that even the highest legislative body of the Union—the legitimate representatives of the nation—are not entrusted with the guardianship of it, or suffered to lay their hands upon it unless when, in cases of extreme danger, the public safety shall make it necessary.   The suspension of this privilege upon slight pretenses it was easily foreseen would destroy its efficacy, and if it depended on the mere will of congress it would become, in the hands of the majority, the most certain and convenient means to accomplish the purposes of party persecution or to gratify political or personal rancor or animosity.   *   *   *

"In England this inestimable privilege has been for ages the proud theme of exultation.   There they worshipped it as a talismanic wand which could unbar the gates of the strongest prison and dissolve in an instant the fetters of the captive.   It was to Englishmen as a wall of fire by night, shielding them from the arbitrary sway of tyrannic power.   *   *   *

"Yet, however important these rights may be, a few moments' reflection will satisfy us that, without the writ of *habeas corpus,* they could avail but little.   The rights may exist as abstract rights, but the writ of *habeas corpus* affords the most important, if not the only means of exercising them.   In vain

does the law proclaim that no man shall be imprisoned contrary to law, if a party has no access to a tribunal to decide the question of legality. In vain does the law promise a trial by peers if the imprisoned party can have no access to a tribunal where he may demand such trial. In short, without the writ of *habeas corpus,* rights of personal liberty, however solemnly proclaimed, would exist but in name. This writ of *habeas corpus* is coeval with the rights which it secures. It existed by force of the common law until the subtleties of lawyers had nearly refined it away, when it was aided by the statute of Charles, and has since been found fully adequate to produce the desired effect. If, then, this privilege has been productive of the most salutary effects in England in guarding the liberty of the subject, we have the strongest proof that we can require of its importance to us except our own experience. It is true we live under a form of government where the sovereignty is acknowledged to belong to the people, but let us not vainly imagine that we have no necessity for laws restrictive upon men in power. Under the fair semblance of republicanism has often been practiced the most detestable tyranny, and the mild laws of a republic have too often afforded a shelter for knaves and tyrants, instead of a shield for the virtuous and oppressed.     *     *     *

"For my own part, I wish to live under a government of laws, and not of men; for, however pure and upright be the intentions of our military commanders, however virtuous and even unsuspected be their conduct, I can never agree that my right to personal liberty shall depend on their forebearance and discretion. I know not whether these men that have been arrested are innocent or guilty of the treason with which they are charged, but, whether innocent or guilty, they must be arrested and tried according

to law. However atrocious the crime which has been committed, the punishment must be according to law. For, in transgressing the limits of the law to revenge upon a criminal the wrongs of society, we are guilty of injustice both to society and the criminal.''

And Mr. Randolph said: ''I make no profession of sympathy for the men who have been denounced as traitors. I argue on the supposition that they are traitors. There is no need of much exertion on behalf of good men. Attacks on the liberty of the people are, as has been stated before, made always in the persons of the vile and worthless. But when precedent is once established in the case of bad men, who, like pioneers, go before to smooth the way, good men tremble for their safety. * * * ''

Mr. Randolph concluded by begging pardon for detaining the house so long, but he could never be indifferent on a subject like this. The house were now to decide if the constitution were only pen, ink and paper, and to be set aside at the whim of every military commander, or whether it were unalterable by fate, and if he who dared to violate it should rue the consequences.—Annals of Congress, 9th Congress, 2d Session, 502, 538.

Accompanying the message of the president was a letter from General Wilkinson in which he stated that he had delivered one person over on *habeas corpus,* but that he had evaded the writ as to the other two and, recognizing that he had violated the law, said that he should look to congress for indemnity. A day or two later the president sent a second message to congress in which he stated that the persons arrested at New Orleans had arrived at the seat of government and that, immediately upon their arrival, he had delivered to the proper authorities all

evidence in his possession and had directed that proceedings be instituted against them at once.

This debate should be very instructive. It was participated in by members from nearly every state, and being at a time so early in our history, should be regarded as contemporaneous with the constitution. The congress composed, as it was, of the ablest men of the times, would not consent to the proposition of suspending the writ of *habeas corpus* for the period of three months, on the ground that it would create not only a dictator in the person of the president, but a horde of petty tyrants through the country, and because the necessity for so doing was not so great and imperious as to justify them in taking that course. From the debate we learn that at no time before had the privilege of the writ been suspended; that, in the opinion of the members of this congress, the general of the army had violated the law in not turning over to the civil authorities those engaged in rebellion against the government; that the writ should not be suspended by congress except the nation itself was in danger; and that, unless the privilege of the writ was suspended, the military could not arrest and hold citizens on suspicion.

During the period of the Civil War John Merryman was arrested by military authority upon vague and indefinite charges, without any proof, so far as it appeared. When a writ of *habeas corpus* was served requiring the officer to produce the body before the chief justice of the United States, in order that inquiry might be made as to the legality of the imprisonment, the officer answered that he had been authorized by the president to suspend the writ of *habeas corpus,* and on that ground refused obedience to the writ. The constitution of the United States contains this provision: ''The privilege of the writ

of *habeas corpus* shall not be suspended unless when, in cases of rebellion or invasion, the public safety may require it." In the constitution of our state the following provision is found: "*That* the privilege of the writ of *habeas corpus* shall *never* be suspended unless when, in *case* of rebellion or invasion, the public safety may require it." The slight difference between the federal and our state constitution is shown by the italics. The provision is found in our bill of rights, and the conjunction "*that*" connects the opening sentence, which is: "In order to assert our rights, acknowledge our duties, and proclaim the principles upon which our government is founded, we declare." The adverb "*not*" of the federal law, is replaced by the more positive adverb "*never*," in ours, and the plural of the noun, "*case*," is used in the national constitution, while in ours the singular appears. Otherwise the sections are identical.

In construing this section of the federal constitution the chief justice of the United States held that the power of suspending the privilege of the writ was solely a legislative power. He quoted from Blackstone, Hallam, Marshall and Story; related the incident occurring in the administration of Jefferson; reviewed the history of the struggles of the English-speaking people which ended in the enactment of the 31st chapter of Charles the Second—an act, as he declares, of great and inestimable value, because it contains provisions which compel courts and judges and all parties concerned to perform their duties in a manner specified in the statute; and closes by saying: "I can only say that if the authority which the constitution has confided to the judiciary department and judicial officers may thus, upon any pretext or under any circumstances, be usurped by the military power at its discretion, the people of the United States are no longer living under a government of

laws, but every citizen holds life, liberty and property at the will and pleasure of the army officer in whose military district he may happen to be found."—Taney's Circuit Court Decisions, 246.

The decision of the chief justice was assailed by many able lawyers of the time, and the chief justice was himself denounced as a sympathizer with the rebellion; yet, notwithstanding the great esteem in which the president was held by the people of the North—notwithstanding the fact that the life of the republic was in danger—loyal courts all over the North sustained the chief justice and decided that the executive had not the power, under the constitution, to suspend the privilege of the writ. And, finally, in 1863, the question was settled. Thaddeus Stevens, the leader of the Union party, succeeded in passing through the house of representatives a bill authorizing the president to suspend the privilege of the writ of *habeas corpus,* and to indemnify him or other officers in cases where damages were awarded for arbitrary arrest. The senate amended the bill and, after a conference between the two houses, it became a law. Thus the executive and legislative branches of the government recognized the principles contended for by the judicial department, and it is settled that congress only has the power of suspending the privilege of the writ of *habeas corpus,* and that it is the sole judge of the conditions which require its suspension.

The language employed is so peculiarly applicable to the case at bar that I shall quote from some of the opinions of those judges who announced that the power to suspend the writ is legislative and not executive. In the case *Ex parte Benedict,* Federal Cases 1292, Judge Hall of the United States court for the Northern district of New York held that the president of the United States is not vested with

power to suspend the privilege òf the writ of *habeas corpus* at any time without the authòrity of an act of congress.   In the course of the opinion he said: "Even in the midst of our present struggle we should not forget the teachings and history of the past and regard as trivial and unimportant constitutional principles, the persistent violation of which led to the dethronement of kings and the overthrow of long-established forms of government.   We should not forget the letters *du cachet* of the French monarchs, nor the illegal imprisonments under Charles I.   In our efforts to read aright and profit by the terrible lesson which the present condition of our unhappy country presents, we should not forget what Hume, and Hallam, and Blackstone, and Marshall, and Story, and Kent, have taught us."

Quoting from Blackstone, he says:. " 'Of great importance to the public is the preservation of this personal liberty; for, if once it were left to the power of any—of the highest magistrate—to imprison whomever he or his officers thought proper (as in France it is daily practiced by the crown), there would soon be an end of all other rights and immunities.   Some have thought that unjust attacks, even upon life and property, at the arbitrary will of the magistrate, are less dangerous to the commonwealth than such as are made upon the personal liberty of the subject.   To bereave a man of life, or by violence to confiscate his estate without accusation or trial, would be so gross and notorious an act of despotism as must at once convey the alarm of tyranny throughout the whole kingdom; but confinement of the person by secretly hurrying him to jail, where his sufferings are unknown or forgotten, is a less public, a less striking, and therefore a more dangerous engine of arbitrary government.   And yet sometimes, when the state is in danger, even this may be a necessary

measure. But the happiness of our constitution is, that it is not left to the executive power to determine when the danger of the state is so great as to render this measure expedient; for it is the parliament only, or legislative power, that, whenever it sees proper, can authorize the crown, by suspending the *habeas corpus* act for a short and limited time, to imprison suspected persons without giving any reasons for so doing, as the senate of Rome was wont to have recourse to a dictator, a magistrate of absolute authority, when they judged the republic in any imminent danger.' ''

Judge Hall then speaks of the opinion of Attorney General Bates, whose views have been adopted in large measure by this court:

"For that gentleman I entertain the highest respect. His purity of motive and character, his great legal acquirements and his undoubted patriotism and ability are unquestioned; but, even in these respects, that excellent gentleman would not want his friend to claim more than that he was the equal of the learned chief justice of the United States. Placing their opinions upon the same footing, they would only neutralize each other, and then the deliberate opinions of Marshall and Story and Martin and other justices of the supreme court who concurred in the opinion of their chief in the case of *Ex parte Bollman,* 4 Cranch 75, supported, as they are, by unanswerable argument, are decisive of the question, and constrain me to decide that the president, without the authority of congress, has no constitutional power to suspend the privilege of the writ of *habeas corpus* in the United States." And Judge Hall ordered the discharge of the prisoner.

In the case *In re Kemp,* 16 Wis. 382, Chief Justice Dixon said: "I think the president has no power, in the sense of the 9th section of the first article of the

constitution of the United States, to suspend the privilege of the writ of *habeas corpus*. It is; in my judgment, a legislative and not an executive act; and the power is vested in congress. Upon this question it seems to me that the reasoning of Chief Justice Taney, in *Ex parte Merryman,* is unanswerable.''

And Justice Cole, in the same case, said: ''To suspend, annul or take away a right given by law is, under our system of government, essentially a legislative function. To deprive a citizen of the privilege of the writ of *habeas corpus* is to take from him one of the highest and most sacred rights secured to him by the constitution and laws of the land. It is a change of the law which, from the nature of things, belongs to the power which can make the law.''

Justice Paine, in answering the question, Where is the power to suspend the writ lodged? said: ''From its very nature it would not naturally be entrusted to a single man, and that man at the head of the military. It is a power dangerous anywhere. It delivers over the nation, for the time being, to the control of the executive. It makes him substantially what the Roman dictator was. No single officer should be allowed to assume such powers upon his own judgment only. The nation that is to be subjected to them should have some voice in determining when the necessity arises for their existence. And as in Rome there was no officer who could assume the power of a dictator upon his own judgment, but such officer had to be appointed by a vote of the senate, so here the power to suspend the writ of *habeas corpus* would naturally have been entrusted to the legislature, and not to the executive alone. There the constitution has placed it. So the supreme court of the United States has declared. So it has been held by every judicial decision, and every elementary writer on constitutional law.''

In *Griffin v. Wilcox*, 21 Ind. 270, and *Warren v. Paul*, 22 Ind. 276, the supreme court of Indiana said that the section of the constitution authorizing the suspension of the writ of *habeas corpus*, in case of invasion or rebellion, was a delegation of power to the legislature, and not to the executive authority.

In the circuit court of the United States for the district of California, and in the case of *McCall v. McDowell*, Judge Deady, delivering the opinion, said with reference to the power of the president to suspend the writ of *habeas corpus:* "I do not propose to argue the question. There are some things too plain for argument, and one of these is, that by the constitution of the United States the president has not the power to suspend the privilege of the writ, and that congress has. The power of the president is executive power—a power to execute the laws, but not to suspend them. The latter is a legislative function, and so far as it exists, belongs naturally and by force of the constitution exclusively to congress."—1 Abbott's U. S. Rep. 212.

A motion for new trial was argued before Justice Field of the United States supreme court and Judge Hoffman, and was denied.

*In re Moore*, 64 N. C. 802, the chief justice says: "I declare my opinion to be, that the privilege of the writ of *habeas corpus* has not been suspended by the action of his excellency; that the governor has the power, under the constitution and laws, to declare a county to be in a state of insurrection, to take military possession, to order the arrest of all suspected persons, and to do all things necessary to suppress the insurrection, but he has no power to disobey the writ of *habeas corpus* or to order the trial of any citizen otherwise than by jury. * *. * It may be that the arrest and also the detention of the prisoner is necessary as a means to suppress the insurrection.

But I cannot yield my assent to the conclusion; the means must be *proper,* as well as necessary, and the *detention* of the prisoner as a military prisoner is not a proper means, for it violates the Declaration of Rights: 'The privilege of the writ of *habeas corpus* shall not be suspended.'—Constitution, art. I, sec. 21.

"This is an *express* provision, and there is no rule of construction or principle of constitutional law by which an express provision can be abrogated and made of no force by an *implication* from any other provision of the instrument."

Upon the subject of martial law the authorities do not appear to be divided. In nearly every case I have cited the question of the right of the president to declare a community to be under martial law was under consideration. In the case *Johnson v. Duncan,* decided in the year 1815, the supreme court of Louisiana decided that the military commander had no authority to declare and enforce martial law, and that his act in so doing was illegal and void. In a note to the case is the following:

"The doctrine established in the first part of the opinion of the court in the above case, is corroborated by the decision of the district court of the United States for the Louisiana district in the case of *United States v. Jackson,* in which the defendant, having acted in opposition to it, was fined $1,000. In Lamb's case Judge Bay, of South Carolina, recognized the definition of martial law given by this court, expressing himself thus: 'If by martial law is to be understood that dreadful system, *the law of arms,* which, in former times, was exercised by the king of England and his lieutenants, when *his word was the law,* and his *will the power* by which it was exercised, I have no hesitation in saying that such a monster could not exist in this land of liberty and freedom. The political atmosphere of America would destroy

it in embryo. It was against such a tyrannical monster that we triumphed in our revolutionary conflict. Our fathers sealed the conquest by their blood, and their posterity will never permit it to tarnish our soil by its unhallowed feet, or harrow up the feelings of our gallant sons by its ghastly appearance. All our civil institutions forbid it, and the manly hearts of our countrymen are steeled against it.''

This case was reported in the year 1816. But the case, above all others, which settles, until reversed, the question of the power of the military, is that of *Ex parte Milligan,* 4 Wall. 2. The case involved the right of a military commission to try a citizen of the state of Indiana under the act of congress referred to herein. The opinion was written by David Davis, the associate, the friend, the appointee, of Lincoln. It is so logical, so patriotic and so convincing that I cannot conceive of a condition or change of thought that will cause its reversal; and it should, in my opinion, be a guide for all courts—a sure and safe guide—which, if followed, will protect the citizen and enforce the law.

Judge Davis said, speaking of the Bill of Rights: ''These securities for personal liberty thus embodied were such as wisdom and experience had demonstrated to be necessary for the protection of those accused of crime. And so strong was the sense of the country of their importance and so jealous were the people, that these rights, highly prized, might be denied them by implication, that when the original constitution was proposed for adoption it encountered severe opposition; and, but for the belief that it would be so amended as to embrace them, it would never have been ratified. Time has proven the discernment of our ancestors; for even these provisions, expressed in such plain English words that it would seem the ingenuity of man could not evade them, are

*now,* after the lapse of more than seventy years, sought to be avoided. Those great and good men foresaw that troublous times would arise when rulers and people would become restive under restraint and seek by sharp and decisive measure to accomplish ends deemed just and proper, and that the principles of constitutional liberty would be in peril unless established by irrepealable law. The history of the world had taught them what was done in the past might be attempted in the future. The constitution of the United States is a law for rulers and people, equally in war and in peace, and covers with the shield of its protection all classes of men, at all times and under all circumstances. No doctrine involving more pernicious consequences was ever invented by the wit of man than that any of its provisions can be suspended during any of the great exigencies of government. Such a doctrine leads directly to anarchy or despotism, but the theory of necessity on which it is based is false; for the government, within the constitution, has all the powers granted to it which are necessary to preserve its existence, as has been happily proved by the result of the great effort to throw off its just authority. * * *

"It follows from what has been said on this subject that there are occasions when martial rule can be properly applied. If, in foreign invasion or civil war, the courts are actually closed, and it is impossible to administer criminal justice according to law, *then,* on the theater of active military operations, where war prevails, there is a necessity to furnish a substitute for the civil authority, thus overthrown, to preserve the safety of the army and society; and as no power is left but the military, it is allowed to govern by martial rule until the laws can have their free course. As necessity creates the rule, so it limits its duration; for, if this government is con-

tinued *after* the courts are reinstated, it is a gross usurpation of power. Martial rule can never exist where the courts are open and in the proper, unobstructed exercise of their jurisdiction.''

In another place Judge Davis says: ''It is claimed that martial law covers with its broad mantle the proceedings of this military commission. The proposition is this: that in a time of war the commander of an armed force (if, in his opinion, the exigencies of the country demand it, and of which he is to judge) has the power, within the lines of his military district, to suspend all civil rights and their remedies and subject citizens as well as soldiers to the rule of *his will,* and in the exercise of his lawful authority cannot be restrained except by his superior officer or the president of the United States. If this position is sound to the extent claimed, then when war exists, foreign or domestic, and the country is subdivided into military departments for mere convenience, the commander of one of them can, if he chooses, within his limits, on the plea of necessity, with the approval of the executive, substitute military force for and to the exclusion of the laws, and punish all persons, as he thinks right and proper, without fixed or certain rules. The statement of this proposition shows its importance; for, if true, republican government is a failure, and there is an end of liberty regulated by law. Martial law established on such a basis destroys every guarantee of the constitution, and effectually renders the 'military independent of and superior to the civil power'—the attempt to do which by the king of Great Britain was deemed by our fathers such an offense that they assigned it to the world as one of the causes which impelled them to declare their independence. Civil liberty and this kind of martial law cannot endure together; the antagonism is irreconcilable; and, in the conflict, one or

the other must perish.   *   *   *   Wicked men, ambitious of power, with hatred of liberty and contempt of law, may fill the place once occupied by Washington and Lincoln; and if this right be conceded, and the calamities of war again befall us, the dangers to human liberty are frightful to contemplate.  If our fathers had failed to provide for just such a contingency, they would have been false to the trust reposed in them.  They knew—the history of the world told them—the nation they were founding, be its existence short or long, would be involved in war. How often or how long continued human foresight could not tell; and that unlimited power, wherever lodged at such a time, was especially hazardous to freemen.  For this and other equally weighty reasons, they secured the inheritance they had fought to maintain by incorporating in a written constitution the safeguards which *time* had proved were essential to its preservation.  Not one of these safeguards can the president, or congress, or the judiciary disturb, except the one concerning the writ of *habeas corpus.*   *   *   *

"The illustrious men who framed that instrument were guarding the foundations of civil liberty against the abuse of unlimited power; they were full of wisdom and the lessons of history informed them that a trial by an established court, assisted by an impartial jury, was the only sure way of protecting the citizen against oppression and wrong.  Knowing this, they limited the suspension to one great right, and left the rest to remain forever inviolable.  But, it is insisted that the safety of the country in time of war demands that this broad claim for martial law shall be sustained.  If this were true, it could well be said that a country preserved at the sacrifice of the cardinal principles of liberty, is not worth the cost of preservation.  Happily it is not so."

It seems to me that everything has been said that can be said, and that the expounders of the constitution have laid out a path that leads to peace and security. And I have quoted from these authorities for the purpose of demonstrating that the civil liberty of these great men and the civil liberty of Colorado to-day are of different species.

But it is said that the governor has greater powers under our constitution than the president has under the national constitution; that because he is given power to suppress insurrection and repel invasion, power sufficient to accomplish the purpose is necessarily implied; that the executive is the sole judge of the means to be employed, and that the Bill of Rights must give way when the governor is engaged in exercising this power. It was because of the fear that the guarantees of personal liberty would be denied by implication that the Bill of Rights was made a part of our constitution, and it was the intention of the people when they adopted the constitution to declare their rights in such plain English that they could not be construed away nor frittered away by implication or evasion. The authority is overwhelming that the position of the governor cannot be sustained; that the power of suspending the privilege of the writ of *habeas corpus* is legislative and not executive; that martial law can only prevail in places where the civil law is overthrown by force, and that it exists only so long as it is necessary to reinstate the courts; that martial law cannot prevail where the courts are open and exercising their functions; that the judicial department will take notice whether the courts are open or have been overthrown by superior force. This court has not undertaken to declare that the position taken by the governor and his special counsel is correct, but has said that the right of the governor to declare and enforce martial law and to

suspend the privilege of the writ of *habeas corpus* is not involved. The court would have sustained the governor, under the authorities, if it were possible to do so; but, finding it impossible to sustain him under the authorities, it has sustained him in spite of them. All courts are in duty bound to sustain the co-ordinate departments of the government when they can be sustained; and I should sustain the executive department if any doubt lingered in my mind as to the right of the head of that department to exercise the great power that he asserts. But I believe that the constitution has been "unnecessarily assailed and rudely violated" by the head of the executive department, and I further believe that this court has removed the landmarks which our fathers have set; and my duty requires me to withhold my approval.

This leads us to a discussion of the opinion in the case. The holding of the court that the respondent is not required to deny the allegations of the petition, but to answer to the writ, which requires him to show by what authority he detains the prisoner, I do not regard as very important, in view of the disposition made of the case. The chief justice of the United States, in the Merryman case, appears to have considered the averments of the petition in deciding the case; and I shall, for the purposes of this, consider one or two facts stated in the petition which I think have a bearing upon the case. The petitioner was not in the county of San Miguel at the time it was declared to be in a state of insurrection and rebellion. He did not go to the county of San Miguel voluntarily, but was taken there by the sheriff upon a warrant charging him with a misdemeanor. The petition alleges that the charge was unfounded, and that it was made and the warrant issued for the purpose of taking him to the county of San Miguel to enable the military authorities to detain him. He

was allowed bail but was, on the following day, arrested by the military officers. If it be true that such acts were committed in this case and we are precluded from making an investigation of the facts, then any person in any part of the state can be carried into the county where it is alleged an insurrection exists and kept there without bail until the commanding officer chooses to release him. This was done in Illinois by the federal officers, and the legality of the arrest was passed upon by the supreme court of that state in the case of *Johnson v. Jones,* 44 Ill. 143.

The court said: "It is a fearful power that is claimed for the government by the counsel for the appellee, and one which no free government ought to possess. Even in England, in the latter part of the last century, when secret political societies were formed hostile to the government and in league with the French revolutionists, or supposed to be so, although the country was at war with France, yet, while the high Tory administration of Mr. Pitt arrested, prosecuted and punished with a pitiless vigor, it acted only through the ordinary agencies of the civil courts, and made no use of the military arm under the pretense that the offending persons were belligerents or public enemies. If this plaintiff was guilty of the charges made in the plea, he merited arrest and a severe punishment, but he should have been punished in conformity to law. It is to be remembered that the question before us is one of power, simply, on the part of the executive, and not of deserving on the part of the plaintiff. If the president could rightfully arrest him by military force and consign him without process or trial to a fortress in the harbor of New York, he could do the same thing to any other person in the state of Illinois, however innocent of crime. * * * As no charge is

made, no judicial investigation had, it is left entirely to the caprice of the government to determine what persons shall be seized. The power to thus arrest being once conceded, every man in the state  *  *  * would hold his liberty at the mercy of the military officer in command.''

In a separate opinion by Justice Breese it is said: ''I cordially concur in the sentiment that the constitution of the United States was designed by its framers, and has been hitherto so understood by the people, to be the same protecting instrument in war as in peace; that a state of war does not enlarge the powers of any one department of the government established by it, nor has any one of these departments any right to urge 'necessity' or 'extraordinary emergencies' as a plea for the usurpation of powers not granted. The first is the tyrant's plea, and the other places the dearest rights of the citizen at the mercy of a dominant party, who have only to declare the 'emergency,' which they can readily create, pretexts for which bad men are keen to find and eager to act upon.''

And the marshal who made the arrest was held liable for damages. So, it seems to me that when one alleges that he is not an insurgent, that he was not in the county where the insurrection is alleged to exist, but that he was carried there by force for the purpose of being placed in the custody of military authorities—conceding everything in the opinion to be a correct statement of the law—there is power in the civil authority to examine the question and determine whether the petitioner is in fact guilty.

It is held by the court that as the governor, under the constitution, is empowered to suppress insurrection or repel invasion, that the recitals in his proclamation that an insurrection exists cannot be controverted because it becomes his duty to determine as a

fact when a condition exists that demands the exer-
cise of his power, and that the judicial department
cannot substitute its judgment for that of the execu-
tive department in matters calling for the exercise
of discretion. As I have before stated, I do not re-
gard the proclamation as of great importance. It
does not seem to me to be necessary to proclaim an
insurrection before undertaking to suppress it, and I
am satisfied that a proclamation is not a condition
precedent to the exercise of the power. An insurrec-
tion may or may not exist, notwithstanding the proc-
lamation of the governor; as an insurrection may
continue long after the governor declares it to have
been suppressed, so it may cease long before his
declaration of peace. The proclamation may deter-
mine the status of the militia, and may be necessary
for the purpose of ordering them to the scene of
insurrection; and the governor has, in my opinion,
the undoubted power to call out the militia at such
time to enforce such laws as in his judgment is proper
for the protection of persons and property, and it is
entirely probable that the act of the governor in call-
ing to his aid the military arm of the government
cannot be questioned, but when it comes to supersed-
ing the civil power and exercising martial law, to dis-
obeying the writ of *habeas corpus* or other process of
the court, to detaining citizens upon suspicion, then
the question of whether an insurrection exists is not
to be determined by the governor's proclamation. If
such is not the law, then, as Justice Breese says, it
"places the dearest rights of the citizen at the mercy
of the dominant party, who have only to declare the
'emergency,' which they can readily create, pretexts
for which bad men are keen to find and eager to
act upon."

I therefore do not assent to the doctrine an-
nounced.

The doctrine announced in the other parts of the opinion I regard as establishing a more dangerous precedent, of more far-reaching consequences, if possible, than the preceding one. And, in order to properly discuss that branch of the case, we should keep constantly before us the words of the supreme court of the United States:

"The constitution * * * is a law for rulers and people, equally in war and in peace, and covers with the shield of its protection all classes of men, at all times and under all circumstances. No doctrine involving more pernicious consequences was ever invented by the wit of man than that any of its provisions can be suspended during any of the great exigencies of government. Such a doctrine leads directly to anarchy or despotism, but the theory of necessity on which it is based is false."—4 Wall. 2.

The court then, as prefatory to a discussion of questions involving various provisions of the constitution, says that "Laws must be given a reasonable construction which, so far as possible, will enable the end thereby sought to be attained. So with the constitution."

The sentence is rather obscure. If the court means that it will not be presumed that the legislature intends what is unreasonable, then I agree with it; but if it means that the dearest right preserved by our constitution—freedom from arbitrary arrest and imprisonment—can be argued away, as impliedly repealed by the authority given to the governor to execute the laws and suppress insurrection, I do not agree with it. The court has not construed the constitution, it has ignored it; and the result is that it has made greater inroads on the constitution than it intended, and that not one of the guarantees of personal liberty can now be enforced. The supreme court of the United States, speaking of the Bill of

Rights, says: "So jealous were the people that these rights, highly prized, might be denied them by implication, that when the original constitution was proposed for adoption it encountered severe opposition; and, but for the belief that it would be so amended as to embrace them, it would never have been ratified. Time has proven the discernment of our ancestors; for even these provisions, expressed in such plain English words that it would seem the ingenuity of man could not evade them, are *now*, after the lapse of more than seventy years, sought to be avoided."

The court then proceeds to give to the constitution what it terms a reasonable construction. After declaring that the petitioner can be restrained of his liberty without warrant and on suspicion only, until such time as the military authority declares the insurrection at an end, it says: "Nor do these views conflict with section 22 of the Bill of Rights, which provides that the military shall always be in strict subordination to the civil power. The governor, in employing the militia to suppress an insurrection, is merely acting in his capacity as the chief civil magistrate of the state, and, although exercising his authority conferred by the law through the aid of the military under his command, he is but acting in a civil capacity. In other words, he is but exercising the civil power vested in him by law through a particular means which the state has provided for the protection of its citizens." This was the argument advanced by Attorney General Bates more than forty years ago, but it has not found its way into the reported decisions of the courts. When the court says that because the governor is the head of the executive department of the state that when he takes command of the military forces he is still at the head of the civil power and that the section of the Bill of Rights that declares "that the military shall always

be in strict subordination to the civil power'' has no
other meaning than that the military shall always be
under the command of the governor, it is simply
annulling that section of the Bill of Rights. The
section referred to must have some meaning. It can
have no meaning if it is construed as the court con-
strues it. I think it has a meaning. The language
used is not obscure or ambiguous. It undoubtedly
means that the civil power shall control at all times,
in war and in peace. The supreme court of the United
States has said that the attempt to make the military
independent of and superior to the civil power by the
king of Great Britain was deemed by our fathers
such an offense that they assigned it to the world as
one of the causes which impelled them to declare their
independence.—4 Wall. 2.

Again the court says: ''To deny the right of
the militia to detain those whom they arrest while
engaged in suppressing acts of violence and until
order is restored would lead to the most absurd
results.'' This sentence inflicts a fatal wound upon
civil liberty, suspends indefinitely the privilege of the
writ of *habeas corpus*, annuls that section of the con-
stitution which declares that no person shall be de-
prived of liberty without due process of law, and
characterizes the declaration of the supreme court of
the United States as an absurdity. I say this because
the opinion declares that the governor is the sole
judge of the conditions which impel him to call forth
the militia, and to withdraw it, and of the necessity
to imprison and detain; and this without regard to
the guilt or innocence of the person imprisoned. This
was the doctrine the supreme court had in mind when
it declared: '''No doctrine involving more pernicious
consequences was ever invented by the wit of man.''

A Union congress declined to invest the beloved
Lincoln with such enormous power and, although it

authorized a suspension of the privilege of *habeas corpus,* it declared the superiority of the civil power by requiring the release of prisoners unless indictment was returned within a limited time.

Again the court says: "If, as contended by counsel for petitioner, the military, as soon as a rioter or insurrectionist is arrested must turn him over to the civil authorities of the county, the arrest might, and in many instances would, amount to a mere farce. He could be released on bail and left free to again join the rioters or engage in aiding and abetting their action, and if again arrested, the same process would have to be repeated, and thus the action of the military would be rendered a nullity." Expressed otherwise, the statement is that we should deny the prisoner one constitutional right because, unless we do, he may take advantage of another. Is it the law of this land that one who has committed a bailable offense shall not be admitted to bail because he may repeat the offense? I think not—I know it is not.

Again the court says: "The arrest and detention of an insurrectionist, either actually engaged in acts of violence or in aiding and abetting others to commit such acts, violates none of his constitutional rights. He is not tried by any military court, or denied the right of trial by jury; neither is he punished for violation of law, nor held without due process of law. His arrest and detention in such circumstances are merely to prevent him from taking part or aiding a continuation of the conditions which the governor, in the discharge of his official duties and in the exercise of the authority conferred by law, is endeavoring to suppress."

I know of no authority that vests in the governor the power to arrest one who he may think will commit an offense. No such power is granted by the constitution nor bestowed by statute. The courts of the

state are open and in the unobstructed performance
of their functions.   Most persons would regard re-
straint of liberty for the period of nearly ninety days
as a punishment; and when the court says that the
petitioner, by his detention, loses none of his consti-
tutional rights, it ignores, it seems to me, that sec-
tion of the constitution which provides that no person
shall be deprived of his liberty without due process
of law.   For, suppose it should transpire that the
petitioner is not guilty of any offense, would not his
imprisonment without charge and for the purpose of
preventing him from committing an offense be an
injustice?   The court has presumed that this man is
an insurgent; the presumption of law is that he is
innocent.   He asserts that he is not guilty, and no
one has charged that he is guilty.   The only state-
ment made which in any way implicates him is that
of the adjutant general, who says that he became con-
vinced by inquiry that he was the leader of a band
of lawless men.   Moyer may be guilty of the most
heinous offenses.   It may be that he deserves to linger
in prison the remainder of his natural life; but he is
entitled to his liberty unless someone, in proper form
and before a proper tribunal, charges him with viola-
tion of the law.   But the court says he is held by due
process of law.   Whatever war power the governor
may have, this power is not due process of law.
Justice Paine, of the supreme court of Wisconsin, in
the case *In re Kemp,* 16 Wis. 419, says:

"The executive, as such, can only execute the
politics of the nation—that is, he executes the laws.
Undoubtedly the constitution and laws do in many
instances trust matters to the discretion of the execu-
tive.   In such instances no other department can con-
trol the exercise of that discretion, but all are bound
by it.   But the difficulty in applying that doctrine in
the manner attempted by the attorney general is, that

the constitution and the laws have not entrusted to the executive, unless in cases where the writ of *habeas corpus* is legally suspended, any political discretion to imprison the people. On the contrary, that matter was deemed of such vital importance that the people regulated it in the fundamental law of their politics, and provided that 'no person shall be deprived of his life, liberty or property without due process of law.' The constitution knows no 'political' process, no political cause of imprisonment. There must be a 'process of law,' a legal cause of restraint. And the power to determine what is a legal imprisonment and to discharge from any that is illegal is, except when the writ is suspended, a power conferred on the judicial department.''

Again the court says: ''If, then, the military may resort to the extreme of taking human life in order to suppress insurrection, it is impossible to imagine upon what hypothesis it can be successfully claimed that the milder means of seizing the persons of those participating in the insurrection or aiding and abetting it may not be resorted to.''

The power to take the life of an insurgent does not include the power to take the life of a person not an insurgent. And, if that be true, then by the process of reasoning that the court adopts, if the military authority may not take the life of one not an insurgent, they may not imprison a person who is not an insurgent. The question is, may the military authorities, when a county is declared to be in a state of rebellion, arrest any person, whether guilty or innocent, and detain him until the executive declares that order has been restored? This question is not answered by the assertion that as the military ''may resort to the extreme of taking human life in order to suppress insurrection, it is impossible to imagine upon what hypothesis it can be successfully claimed

that the milder means of seizing the persons of those participating in the insurrection or aiding and abetting it may not be resorted to." The question can be answered in the affirmative in no other way than by declaring that the executive has the power to suspend the privilege of *habeas corpus,* or by declaring that martial law prevails whenever the executive so proclaims. The decision has applied the Articles of War to conditions that do not justify their application. Whatever may be said of the deplorable condition in San Miguel county that resulted in foul assassinations, in murder and in plunder, so revolting to the law-abiding citizen, these conditions were past at the time the petitioner was taken there. The civil authorities of the county, with the aid of the military, had full possession and control; and if the petitioner was in any way implicated in the commission of these foul crimes, it should have been so charged.

The court then says: "No case has been cited where the precise question under consideration was directly involved and determined, but in cases where the courts have had occasion to speak of the authority of the military to suppress insurrection and the means which may be employed to that end, it has been stated that parties engaged in riotous conduct render themselves liable to arrest by those engaged in quelling it."

Chancellor Kent, at page 8 of volume 2 of his Commentaries, says: "It requires more than ordinary hardiness and audacity of character to trample down principles which our ancestors cultivated with reverence; which we imbibed in our early education; which recommend themselves to the judgment of the world by their truth and simplicity; and which are constantly placed before the eyes of the people,

accompanied with the imposing force and solemnity of a constitutional sanction.''

What connection there is between the right of a military officer to arrest a person on suspicion only and hold him without preferring any charge against him, because he fears he may commit an offense, and the right of an officer to arrest a rioter caught red-handed, I cannot comprehend. Although it is true, as stated by the court, that the precise point upon which the decision rests has never been determined by other courts, it is not because that point was not presented and urged by counsel, nor because the opportunity for so deciding was not afforded the judges; and it must be that the reason the point has not been sustained by some other court is that no other court could concede to the executive all the power he would have if the privilege of the writ of *habeas corpus* were suspended without determining that he had the power to suspend the writ. During the great rebellion when millions of soldiers were in the field and when hundreds of persons in the loyal states were suspected of actively aiding those engaged in rebellion, and arrested, the courts might have held that the necessity for putting down the rebellion carried with it the power to arrest and detain suspected persons, notwithstanding the guarantees of the constitution, but not one of them did so. There is no dearth of authority in this country or in England directly contrary to the ruling of this court.

I can find no middle ground to stand upon; and I most certainly cannot assent to the novel doctrine announced by this court. If one may be restrained of his liberty without charge being preferred against him, every other guarantee of the constitution may be denied him. For, as said by the supreme court of Illinois:

"It is undeniable, if the government had the right to arrest him without a warrant and imprison him without a trial or charge of any criminal offense, it had an equal right to send his case before a court martial or military commission. The right to do the one necessarily implies the right to do the other, because both rest on the same theory of power to be exercised by the government in time of war. If it was lawful to arrest and imprison the plaintiff without any form of judicial investigation, it would certainly have been not less lawful to do the same thing upon the finding and sentence of a military tribunal. It can hardly be said that the laws of war could be applied to the plaintiff for the purposes of punishment, but not for the purposes of trial."
—*Johnson v. Jones*, 44 Ill. 156.

The constitutional privileges are not, in the nature of things, separable. It was intended by our fathers that all should be inviolable except one, and that to be suspended by the legislature only in case of great emergency. Martial law exists or it does not exist. When it exists, there is no civil law. Martial law and civil law cannot exist together. If the civil law can enforce one guarantee, it can enforce all. If the civil law is overthrown, it is powerless to enforce any right. When martial law does not prevail, unless the privilege of the writ of *habeas corpus* is suspended, every right guaranteed by the constitution is enforceable; and the constitution is violated, rudely violated, when one is deprived of liberty without due process of law.

*Habeas corpus* is the proper remedy to release from arbitrary arrest and, unless its privileges have been suspended, one is not subject to arrest on suspicion merely, and detention beyond the time fixed by statute for return to the writ. As the privilege of the writ has not been suspended, as the courts are

open, as martial law does not prevail, and as no charge has been preferred against the petitioner, he should be discharged.

The greatness of this country consists in being able to protect, by the shield of its constitution, the humble and the exalted, the pure and the wicked. We gave the wretches Guiteau, Prendergast and Czolgosz trials by due form of law, and by so doing we strengthened the nation at home and abroad. Had we departed from the principles declared by our fathers, we should have lessened the liberty of every citizen and imperiled the title to all property.

When we deny to one, however wicked, a right plainly guaranteed by the constitution, we take that same right from everyone. When we say to Moyer, "You must stay in prison because if we discharge you, you may commit a crime," we say that to every other citizen. When we say to one governor, "You have unlimited and arbitrary power," we clothe future governors with that same power. We cannot change the constitution to meet conditions. We cannot deny liberty to-day, and grant it to-morrow; we cannot grant it to those theretofore above suspicion, and deny it to those suspected of crime: for the constitution is for all men—"for the favorite at court; for the countryman at plow"—at all times, and under all circumstances.

We cannot sow the dragon's teeth, and harvest peace and repose; we cannot sow the wind, and gather the restful calm.

Our fathers came here as exiles from a tyrant king. Their birthright of liberty was denied them by a horde of petty tyrants that infested the land—sent by the king to loot, to plunder and to oppress. Arbitrary arrests were made; and judges, aspiring to the smile of the prince, refused by "pitiful evasions" the writ of *habeas corpus.* Our people were banished;

they were denied trial by jury; they were deported for trial for pretended offenses; and they finally resolved to suffer wrong no more, and pledged their lives, their property and their sacred honor to secure the blessings of liberty for themselves and for us, their children. But if the law is as this court has declared, then our vaunted priceless heritage is a sham, and our fathers stood "between their loved homes and the war's desolation" in vain.

GABBERT, C. J.

Although the petition for rehearing was voluntarily withdrawn by petitioner, I deem it appropriate, in view of the questions discussed in the dissenting opinion, to make the following observations:

That opinion, in my judgment, falls far short of a discussion of the questions upon which the decision of the court is based. In the first place, the question of deportation is not involved. In the second place, it is not held that the governor has the power to suspend the privileges of the writ of *habeas corpus* or declare martial law. No opinion is expressed on either of these propositions, and hence all that is said in the dissenting opinion on these subjects and the voluminous excerpts are foreign to the questions involved. It is determined that petitioner was not entitled to his discharge, not because the privilege of the writ of *habeas corpus* was suspended, or the governor had declared martial law, but for the reason that the governor, through his subordinate officers, was exercising a power conferred upon him by the fundamental law of the state. No court has been more emphatic than this in declaring that the constitution of the state is the paramount law; that each of the three co-ordinate branches of government derives its authority from that source; that the power of each is thereby limited and defined; that neither is

superior to the other; that each acting within its proper sphere is supreme; and that neither can call the other to account for actions within its province, nor can one interfere with the other in the performance of functions delegated by the constitution. The judiciary has no power to call out the militia or to direct its movements. This power and the conditions under which it may be exercised is, by the fundamental law of the state, vested in the governor and in him alone. If the judicial department should undertake to review the facts upon which the governor acted, it would be a direct interference with his authority and an assumption of power on the part of the judiciary which does not exist. It would be just as logical to assume, in case the legislature had suspended the privilege of the writ of *habeas corpus* (if clothed with that power by virtue of section 21 of article II of the constitution), that the judiciary could inquire whether the conditions existed which justified the legislative department in taking such action, as to hold that the facts upon which the governor acted in declaring a state of insurrection and in arresting the petitioner were subject to review by the judicial department of the state.

The constitution has clothed the governor with the power to take the steps he did, and he cannot be called to account by the judicial department for this action, nor can the latter inquire into or determine whether or not the conditions existed upon which he based his action. That is a matter which, in the circumstances of the case, the chief executive must determine for himself, and his subordinates, acting in obedience to his orders, must determine for themselves, and when so determined, is conclusive.

A recent decision by the supreme court of the Philippine Islands is direct authority supporting this conclusion. Attention was directed to the case by a

brief review in the December, 1905, number of "Case and Comment," from the publishers of which a copy of the opinion was obtained. The case is No. 2808, and entitled "*Feliz Barcelon v. David J. Baker. Jr., Colonel, etc., et al.*"

Section 5 of the act of congress, known as the "Philippine Bill," provides: "That the privileges of the writ of *habeas corpus* shall not be suspended unless when, in cases of rebellion, insurrection or invasion, the public safety may require it, in either of which events the same may be suspended by the president or by the governor-general, with the approval of the Philippine commission, whenever, during such period, the necessity for such suspension shall exist." By virtue of this provision, the proper authorities had suspended the privileges of the writ of *habeas corpus* in the province of Batangas, because of the existence of conditions which the section quoted was designed to cover. The petitioner was taken into custody and restrained of his liberty by the respondents, representing the legally constituted authorities of the province, and sought to be released by proceedings in *habeas corpus,* claiming that there did not exist in the province named, nor in any part thereof, rebellion, insurrection or invasion in any form or degree, and that all the courts of law organized and provided by law for the province had been at all of the times in the petition mentioned in the full and complete exercise of their functions without interruption of any nature or kind. The respondents claimed that the court was without jurisdiction or authority to grant the writ of *habeas corpus* in the province of Batangas, for the reason that on January 31, 1905, the governor-general, with the approval of the Philippine commission, had suspended the privileges of the writ in the province, basing such suspension upon the fact that organized

bands in the province were in open insurrection against the constituted authorities, and were still in open resistance thereto. Counsel for petitioner contended that the judicial department of the government could consider an application for the writ of *habeas corpus* even though the privileges of the same have been suspended in the manner provided by law, for the purposes of taking proof upon the question whether there actually existed a state of insurrection, rebellion or invasion. The question was thus squarely presented whether the judicial department could investigate the facts upon which authorized officials acted in suspending the privileges of the writ in the province mentioned. On this proposition Mr. Justice Johnson, in the course of an able and instructive opinion, speaking for the court, said:

"Inasmuch as the president or governor-general, with the approval of the Philippine commission, can suspend the privileges of the writ of *habeas corpus* only under the conditions mentioned in the said statute, it becomes their duty to make an investigation of the existing conditions in the archipelago or any part thereof to ascertain whether there actually exists a state of rebellion, insurrection or invasion, and that the public safety requires the suspension of the privileges of the writ of *habeas corpus*. When this investigation is concluded the president or the governor-general, with the approval of the Philippine commission, declares that there exists these conditions, and that the public safety requires the suspension of the privileges of the writ of *habeas corpus,* can the judicial department of the government investigate the same facts and declare that no such conditions exist? * * * If the investigations and findings of the president or the governor-general, with the Philippine commission, is not conclusive and final as against the judicial department of the gov-

ernment, then every officer whose duty it is to maintain order and protect the lives and property of the people may refuse to act, and apply to the judicial department of the government for another investigation and conclusion concerning the same conditions to the end that they may be protected against civil actions resulting from illegal acts."

"Owing to conditions at times a state of insurrection, rebellion or invasion may arise suddenly and may jeopardize the very existence of the state. Suppose, for example, that one of the thickly populated governments situated near this archipelago, anxious to extend its power and territory, should suddenly decide to invade these islands and should, without warning, appear in one of the remote harbors with a powerful fleet and at once begin to land troops. The governor or military commander of the particular district or province notifies the governor-general by telegraph of this landing of troops and that the people of the district are in collusion with such invasion. Might not the governor-general and the commission accept this telegram as sufficient evidence and proof of the facts communicated, and at once take steps, even to the extent of suspending the privileges of the writ of *habeas corpus,* as might appear to them to be necessary to repel such invasion? It seems that all men interested in the maintenance and stability of the government would answer this question in the affirmative. But suppose some one who has been arrested in the district upon the ground that his detention would assist in restoring order and in repelling the invasion applies for the writ of *habeas corpus,* alleging that no invasion actually exists; may the judicial department of the government call the officers actually engaged in the field before it and away from their posts of duty for the purpose of explaining and furnishing proof to it concerning the existence or non-

existence of the facts proclaimed to exist by the legislative and executive branches of the state? If so, then the courts may effectually tie the hands of the executive, whose especial duty it is to enforce the laws and maintain order, until the invaders have actually accomplished their purposes. The interpretation contended for here by the applicant, so pregnant with detrimental results, could not have been intended by the congress of the United States when it enacted the law. It is the duty of the legislative branch of the government to make such laws and regulations as will effectually conserve peace and good order and protect the lives and property of the citizens of the state. It is the duty of the governor to take such steps as he deems wise and necessary for the purpose of enforcing such laws. Every delay and hindrance and obstacle which prevents a strict enforcement of laws under the conditions mentioned necessarily tends to jeopardize public interests and the safety of the whole people. If the judicial department of the government, or any officer in the government, has a right to contest the orders of the president or of the governor-general under the conditions above supposed before complying with such orders, then the hands of the president or the governor-general may be tied until the very object of the rebels or insurrectos or invaders has been accomplished.''

It is also urged on behalf of petitioner that the authorities vested with the power to suspend the privileges of the writ of *habeas corpus* ''might reach a wrong conclusion from their investigations of the actual conditions, or might, through a desire to oppress and harass the people, declare that a state of rebellion, insurrection or invasion existed, and that public safety required the suspension of the privileges of the writ of *habeas corpus* when actually and in fact no such conditions did exist. We cannot

assume that the legislative and executive branches will act or take any action based upon such motives.''

And further considering this proposition, the court said: ''Can the judicial department of the government, with its very limited machinery for the purpose of investigating general conditions, be any more sure of ascertaining the true conditions throughout the archipelago or in any particular district than the other branches of the government? We think not.''

In conclusion, the learned judge, in speaking of the functions of the three departments of government, said:

''They are all joined together in their respective spheres, harmoniously working to maintain good government, peace and order, to the end that the rights of each citizen be equally protected. No one department can claim that it has a monopoly of these benign purposes of the government. Each department has an exclusive field within which it can perform its part within certain discretionary limits. No other department can claim a right to enter these discretionary limits and assume to act there. No presumption of an abuse of these discretionary powers by one department will be considered or entertained by another. Such conduct on the part of one department, instead of tending to conserve the government and the rights of the people, would directly tend to destroy the confidence of the people in the government and to undermine the very foundations of the government itself.''

The gist of the decision is, that the act of congress vested the authorities named with the power to determine whether or not conditions existed which authorized the suspension of the privileges of the writ, and that their determination of the facts upon which they acted was conclusive and could not be

inquired into by any other branch of the government. Many authorities are cited and quoted from which fully sustain this conclusion, and the opinion is particularly valuable because of the great number of authorities collated upon the subject.

The fundamental law of this state has vested the governor with the exclusive power to call out the militia, to execute the laws, suppress insurrection or repel invasion. No other department of the government can exercise this power. The governor alone must determine whether or not the conditions exist which authorize him to exercise the authority through the means indicated by the constitution to suppress insurrection. The determination upon his part that such conditions do exist must necessarily be conclusive upon all persons and all other departments of government; otherwise incongruous results and anarchy would follow. The militia might refuse to obey the orders of the chief executive; his subordinate officers might refuse to act because, in their judgment, the exigency did not exist upon which he based his action; the courts could tie his hands and render him powerless, while the people in the disaffected districts would be left to the mercy of the insurrectionists pending the settlement of a clash between different departments of government on the question of the existence of conditions in a locality which required the presence of the military to correct. When the chief executive decides that an insurrection exists, the courts are concluded thereby, because that is a legal fact ascertainable only from his decision on that question. The same power which determines the existence of an insurrection must, also, decide when the insurrection has been suppressed. It has long been settled that the governor cannot be enjoined from the performance of an executive act, and it is equally well settled that the

judicial department cannot coerce him to perform such act. By the constitution the calling forth of the militia is an executive act, and, certainly, in the face of these propositions, no one would claim that the judiciary could either enjoin or coerce that act, nor, in case of his failure to perform his duty in this respect, could any other department of the government assume to do that which the fundamental law of the state has conferred exclusively upon the governor.

While the question is not involved or touched upon in the Philippine case, it logically follows, from the conclusion there announced, that with the privilege of the writ of *habeas corpus* suspended, the legality of the arrest and imprisonment of one taken into custody by the lawfully constituted authorities cannot be inquired into. It must also follow that when the governor has exercised the power vested in him to call out the military to suppress an insurrection, the arrest and detention by the military of one taken into custody as an insurrectionist by the particular force which the governor is authorized to employ to suppress an insurrection cannot be inquired into by the courts.